1
2
3
4
5
6
7
8
9
10
11
12
13

14                    UNITED STATES DISTRICT COURT
15             **CENTRAL DISTRICT OF CALIFORNIA**

16   EMILY Q. et al.,                    )      CASE NO. CV 98-4181 AHM (AJWx)
17                                        )
               Plaintiffs,               )      **SPECIAL MASTER'S PROPOSED**
18                                        )      **WORK PLAN IN RESPONSE TO**
          v.                             )      **COURT'S ORDER APPOINTING**
19                                        )      **SPECIAL MASTER FEBRUARY**
20                                        )      **21, 2008**
21   DIANA BONTA,                        )
22                                        )
               Defendant.                       Honorable A. Howard Matz
23                                        )      Courtroom 14
24                                        )

25        This Proposed Work plan is written in response to an Order of the Court issued on

26   February 21, 2008 regarding the Appointment of Richard Saletta as Special Master.

27
28
29                                      1

1    PROPOSED WORK PLAN

2           The Interest-Based approach has the greatest likelihood of bringing all the parties

3    together to create accessible, effective, and sustained TBS for children and their families

4    in the Emily Q class in California.  This approach is a proven method for resolving

5    conflict and reaching sustainable agreements among differing parties.  The Court

6    recognizes the complexity of the task, wants a speedy solution, and has agreed to Mr.

7    Saletta's approach, which is summarized below.

8

9    Emily Q Implementation Work Group Approach Summary:

10          The first challenge will be to make the transition from the position-based

11   contested environment that has prevailed for nearly ten years to an interest-based

12   consensus environment where the various parties can work together to construct a shared

13   solution to the Emily Q matter.  The Special Master needs to redefine the participant roles

14   from "Plaintiffs v. Defendants" to "Parties of Mutual Interests" and the former litigants

15   need to shift from unilateral litigated action to a negotiated settlement based on common

16   ground.  To begin this shift, the Implementation Work Group will engage in a structured

17   group interview over a period of several meetings to draw out the various interests that

18   must be addressed in the TBS plan.  We will develop an exhaustive inventory of interests

19   as the foundation for designing a consensus-based TBS plan.  If the right set of

20   participants remains engaged throughout this process, all their combined interests should

21   reflect the full set of interests across all the Emily Q stakeholder groups.  The intent is to

22   get all the interests on the table so that there are no unstated interests or hidden agendas

23   that would derail the design process as the work group moves forward.  Typically, once

24   all the interests have been articulated and recorded, participants are less likely to argue

25   their separate positions (or return to Court) and more likely to be working together to find

26   the best ways to meet all the interests.  The primary goal of this section of the work group

27   process will be to find common interests and build a TBS solution on that foundation.

28   The secondary or fall-back goal of this section will be to inform the Special Master of the

29   full set of interests so that he can design the best possible solution if the group cannot

30   reach consensus.

31                                             2

1      During this interest discussion, Work Group members will develop a list options

2    that they believe should be included in the TBS plan.  Once the bulk of interests have

3    been articulated and recorded, the work group will begin evaluating the various proposed

4    options in the context of the full set of interests.  The purpose will be to systematically

5    narrow the list of options into specific components of a TBS plan capable of meeting all

6    the interests.  It is understood that, at any time, any participant can return to Court if they

7    believe their interests are not being addressed through the work group process.  However,

8    the nature of this interest-based approach should reduce the likelihood that participants

9    will return to Court – they should be able to work out their concerns through the interest-

10   based option evaluation process to ensure that the interests they represent are addressed

11   in the TBS plan.

12

13      The goal of the plan design effort is to construct a consensus-based permanent

14   solution to TBS that will not end up back in court.  We will seek the best possible

15   solution, balancing the real over the ideal, and the good over the perfect.  The plan will

16   require compromise in order to address the various interests and to be a realistic solution

17   that can be implemented within the current needs and services environment.  The group

18   will strive for consensus, which is defined as: Everyone accepts the decision; everyone is

19   willing to support its implementation; and everyone can live with the consequences.

20   Clearly, if consensus cannot be reached, the participants are likely to return to litigation

21   as a way to meet their interests, and the Court will expect the Special Master to construct

22   a TBS recommendation to the Court on all the information that has been gathered to date.

23   To avoid a breakdown in the consensus process, the work group will continually revisit

24   and review the interests and the options in order to develop a working TBS plan within

25   the parameters established in the Court Order – the plan will focus on a TBS rate (or

26   rates), exit criteria for the Court, a qualitative review process, and a means to ensure

27   compliance after Court exit.  The plan also will need to satisfy additional objective

28   criteria, including that the processes be measurable (quantitative and qualitative

29   measures), evidence-based to the extent possible in the existing research literature, and

30   conform to best practices and established performance standards in the professional field.

31                             3

1      For some aspects of plan development, the work group will request technical
2   assistance from outside experts and organizations familiar with TBS research and
3   performance standards.  Throughout the plan design process, the work group will
4   continually evaluate the capacity of the emerging TBS plan to meet all the interests
5   among the various parties and stakeholders – this effort to ensure that all interests are
6   being addressed in the plan is the best strategy to prevent the process from breaking down
7   and the parties returning to litigation.  It is the intent of the Special Master to complete a
8   plan for implementation by Fall of 2008.
9
10      During the Implementation phase, which will last approximately 12 months, key
11   tasks for the work group will be to monitor the new TBS process, continuously measure
12   and evaluate progress toward intended benchmarks, get feedback from the various
13   stakeholders, and correct and redesign the plan into a final TBS plan that will take effect
14   by August 2009, at which time the Court can exit the process with a high likelihood that
15   the work group partners can preserve an on-going TBS process without returning to
16   Court litigation.
17
18      As mentioned above, this Interest-Based approach is a proven strategy to bring
19   together conflicted or litigating parties in an agreeable and sustainable solution that meets
20   their interests.  The timeframe placed by the Court is short and the participants will have
21   to work seriously to create the desired TBS solution.  The Special Master believes that
22   the approach outlined above is the most promising way to resolve the TBS conflicts and
23   end nearly ten years of litigation in the Emily Q case.
24      The times proposed above are projections based on the assumption of meeting
25   two to three times a month for Solution-Focused Decision Making meetings and periodic
26   individual meetings with key parties during the first year; these estimates depend on the
27   actual frequency of meetings and progress made.
28
29
30                                          4

1    **Annual Budget-Anticipated Costs for Year 1**

2    <u>Special Master:  666 hrs @ 150.00/hr =$99,900.00</u>

3          The amount of time needed monthly and weekly would vary, depending on what

4    phase the parties are in regarding Implementation of the Amended Order.  The approach

5    utilized in bringing this matter to a successful conclusion involves three phases.

6          Budget Narrative:  Year One is divided into three phases.  In Phase I –

7    *Foundation Building* and Phase II -*Design* -up to 8 months, projected at 64 hours per

8    month (approximately 513 hours), and in Phase III –*Implementation* –up to 4 months,

9    projected at 38 hours per month (approximately 153 hours) for a combined one-year total

10   of 666 hours.

11         Phase I and Phase II will be the most intense and will focus on the

12   alignment of interests, building common ground, identifying meaningful options,

13   narrowing down the options and detailing out the elements necessary to implement the

14   Amended Order.  Phase III will involve monitoring, modifying, or updating elements of

15   the implementation strategy that are not working, or reviewing an unplanned opportunity

16   or strategy that shows promise, based on feedback from the field.

17

18         Detailed proposals covering the requirements of the Amended Order will be

19   developed by the parties, and prior to the end of year one the Court will be able to review

20   a number of recommendations for implementation that have the agreement of all parties.

21   The times proposed above are projections based on the assumption of meeting two to

22   three times a month for the Emily Q Implementation Work Group and periodic individual

23   meetings with key parties during the first year; these estimates depend on the actual

24   frequency of meetings and progress made.

25

26   <u>Professional Services:  323 hrs @ $85.00/hr= $27,455.00</u>

27         Budget Narrative:  Because of the technical complexity of the issues regarding

28   implementation of TBS services at the state, county, and private provider levels, I will

29   require technical support from an experienced researcher and evaluator who is familiar

30   with Mental Health services including fiscal processes, service delivery, accountability

31                             5

1   measures, and program evaluation.  I also wish to draw on the support of an experienced

2   co-facilitator for the various planning meetings.  I am projecting these Professional

3   Services at approximately 27 hours per month for twelve months (323 hours total).

4   Travel and Incidental Costs for Year 1:

5        I anticipate that the majority of meetings will take place in Sacramento, within

6   one hour of my office.   At this time I have determined that these travel and peripheral

7   expenses can be adequately met through the basic hourly rate.  As such, except for travel

8   and attendant expenses incurred attending court proceeding or meeting the court, I am not

9   planning on submitting an expense invoice.

10

11       In conclusion, I look forward to serve as your Special Master for the Emily Q

12  matter.

13

14

15

16

17  Dated:  March 11, 2008                    Respectfully Submitted

18

19

20

21

22                                           Richard Saletta, LCSW

23                                           Special Master

24

25                              6