

CLERK, U.S. DISTRICT COURT

SEP 2 5 2008

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY Q. et al., | ) CASE NO. CV 98-4181 AHM (AJWx) |
| Plaintiffs, | ) **SECOND QUARTERLY REPORT IN RESPONSE TO COURT'S ORDER APPOINTING SPECIAL MASTER FEBURARY 21, 2008** |
| v. | ) |
| DIANA BONTA, | ) Honorable A. Howard Matz<br>) Courtroom 14 |
| Defendant. | ) |

**Introduction**

This report is the second report submitted pursuant to the Court's "Order Appointing Special Master" of February 21, 2008. The report covers the time period from July 27, 2008 through September 28, 2008. During this period of time, the Special Master implemented Phase Two of his Therapeutic Behavioral Services (TBS) planning approach, *Plan Design*, of the Three Phase Work Plan submitted to the Court on March 11, 2008. This report to the Court contains four sections: 1) a brief summary of the plan design effort; 2) a summary of the Emily Q Settlement Plan; 3) recommendation to the Court regarding the plan; and 4) appendices containing details of the plan.

**Brief summary of the plan design effort**

The Plan Design Phase required bringing together the same core Work Group of parties that were identified in the Special Master's July 2008 Quarterly report to create accessible, effective and sustained TBS for children and their families in the Emily Q class in California. (See Appendix A for a complete list of participants, names and titles).

There has been a significant change to the Work Group. During this last month, the State Department of Mental Health lead representative, Assistant Deputy Director

1   Mike Borunda, left the Department and transferred to another state department on short
2   notice. Mr. Borunda's departure was an untimely loss to the Work Group's efforts.
3   However, the Department took immediate action to assign Sean Tracy, Chief of Strategic
4   Planning and Policy to the Emily Q Work Group, and gave Mr. Tracy the necessary
5   authority to commit the Department fully to the Work Group's effort; additionally,
6   CDMH Director Dr. Steven Mayberg has provided assurances to the Special Master and
7   the Work Group that the changes in leadership will not slow down or limit the progress of
8   the Work Group. Mr. Tracy has already stepped into the lead role for CDMH and is
9   rapidly coming up to speed as Phase Two of the planning process approaches completion.
10          This core TBS Work Group has met four times in Sacramento during the past
11   three months to complete the Plan Design phase. In addition, eight smaller "Task
12   Groups" primarily utilized conference calls in lieu of meetings to operationalize the eight
13   points and charters identified in the July Quarterly Report. These eight points and
14   charters, agreed on by all parties, comprise the various elements of the TBS plan and
15   together lay out a coherent and potentially successful solution to the Emily Q matter.
16          The TBS Work Group parties continue to show remarkable commitment to
17   meeting the Court's expectations and orders. In spite of the State of California having no
18   budget for the past sixty plus days, which has resulted in most state employees and
19   contractors not getting paid, representatives to this Work Group have kept their focus and
20   energy on successfully completing the Court's charge. The consensus recommendations
21   presented to the Court would not have been possible without each member of the Work
22   Group's thoughtfulness about their charge, expertise, dedication and persistence to
23   getting the job done.
24          Since my July report, national and state economic and financial troubles continue
25   to become more pronounced each day in California. The depth and scope of home
26   foreclosures, upheaval in the financial markets, a marked decline in state and county
27   revenues, the prolonged absence of a state budget, and the withholding of state worker
28   pay and canceling of state contracts have increased the pressures on whatever revenues
29   are available for the state and local governments. The shortages of state and local
30   revenues have increased tensions between the state and the counties. As a result, state
31   and county relationships are strained – counties perceive that they have been consistently

1   under-funded by the state in the Medi-Cal program, and in some cases un-funded. They

2   see the realignment funding stream that transfers revenues from the state to the counties

3   as having run its course and now failing to meet minimum funding requirements.

4   Furthermore, counties have experienced increased administrative and compliance

5   requirements imposed by the state without any negotiation. Counties cite as an example

6   the 2002-03 governor's action requiring a 10% match on all EPSDT, which has

7   essentially reduced the rate of growth of EPSDT and has especially impacted the

8   implementation of TBS. As a result of the overall limitations on funding and increased

9   administrative requirements on the Mental Health Medi-Cal program, some counties are

10   considering returning the Medi-Cal mental health program to the state.

11        An example, germane to the Emily Q settlement efforts, regarding how current

12   conditions have affected the planning effort, is reflected in the general comments and

13   position of the California Mental Health Directors Association (CMHDA) representatives

14   to our Work Group. The CMHDA representatives agree in principle with the Work

15   Group Recommendations and will work hard to see that they are successfully

16   implemented. However, they want to be sure the Court is informed, from their

17   perspective, that there is an additional step required to implement specific elements of

18   this settlement. It is their position that the administrative and accountability requirements

19   outlined in the Nine Point Emily Q Settlement will impact county direct and indirect

20   Medi-Cal program costs, and that these costs would need to be calculated and negotiated

21   with counties consistent with state law. They offer this caveat to suggest that there may

22   be some delays in implementing parts of the Settlement.

23

24        I share this only to inform the Court about the conditions that exist today,

25   conditions that were not present 1999, in order to be realistic and clear about conditions

26   on the ground that are going to impact the Proposed Plan as it rolls out. I am optimistic

27   about the effort the state and counties will make to implement this plan and, along with

28   the continued support and supervision of the Court, I am encouraged about the long term

29   positive outcome.

30

**Summary of the Emily Q Settlement Plan**

The Emily Q Work Group consists of representatives of the state agencies and county mental health plans involved in implementing TBS, and of plaintiff class members and their families; the group has been meeting with the Special Master since April 2008 to develop this plan. (See Appendix A for members). The Work Group has developed a nine-point plan that will result in increased access to and improved delivery of Therapeutic Behavior Services (TBS) to members of the Emily Q class. This plan creates a comprehensive set of requirements for settling the Emily Q lawsuit and ensuring Court exit from the case.

In brief, this plan:

1. Eliminates many administrative requirements that have burdened counties in the past and have reduced the use of TBS;

2. Presents simple and direct language to clarify TBS eligibility requirements;

3. Establishes an accountability process and structure the California Department of Mental Health (CDMH) will use to monitor and improve TBS utilization in every county;

4. Describes a TBS best practice approach from assessment through service delivery and termination;

5. Proposes a multiagency coordination strategy to engage Social Services and Juvenile Justice agencies at the state and county levels in order to increase and improve TBS service access and delivery;

6. Establishes a statewide TBS training program;

7. Outlines technical assistance manuals covering both TBS practice and chart documentation;

8. Outlines an outreach strategy to increase awareness of TBS and expand its utilization statewide; and

9. Defines a process that will result in Court exit from the Emily Q matter.

4

1    There is agreement within the Emily Q Work Group that these nine points
2    represent a coherent plan capable of resolving the long-standing issues that arose from
3    many years of litigation. There is also agreement that this proposed plan is likely to
4    produce meaningful, measurable, and lasting solutions for the Emily Q class. The Work
5    Group members agree that additional time and data will be required to assess the impact
6    of the changes in this plan and propose that jurisdiction be extended until December 31,
7    2010.
8
9    This plan creates positive incentives for the county mental health plans (MHPs) to
10   increase utilization significantly within the next 24 months. During this time period,
11   CDMH has committed resources to help the counties improve coordination with the other
12   local agencies (such as the juvenile courts) responsible for class members, with a goal of
13   identifying expansion populations for TBS. A newly agreed-upon "data dashboard" will
14   keep MHPs apprised of their progress in increasing utilization. MHPs will know that if
15   they fail to increase utilization voluntarily during this two-year period, they run the risk
16   of stronger compliance oriented measures in the future.
17
18   All participants have agreed to defer the decision to set a TBS utilization rate in
19   order to assess the results of the new incentives. This process will be more fully set out
20   in the exit criteria plan to be presented to the Court in January 2009. With regard to Point
21   Three (Structured Accountability) of this proposed plan, the county representatives on the
22   Emily Q Work Group are not in agreement with certain provisions of the accountability
23   process that they believe will add considerable administrative and cost burden to some
24   counties and, for that reason, have declined to fully endorse Point Three.
25
26   The following sections describe each of the nine points in this proposed Emily Q
27   Settlement Implementation Plan. The Emily Q Work Group, the Special Master, and
28   CDMH will collaborate to ensure the complete and successful implementation of this
29   plan.
30
31

***Point 1***: Streamline the TBS Administrative Requirements

Purpose:  Identify, reduce, and/or eliminate no longer necessary elements of the administrative process and court-ordered requirements.  Simplify necessary requirements.

Steps:
- CDMH shall eliminate various existing Court and CDMH requirements that have been completed and/or that are no longer needed, or are outdated, or are duplicative.
- CDMH shall eliminate quarterly data gathering and reporting requirements from the MHPs that are currently of little benefit, or that create barriers to services.
- CDMH shall eliminate TBS pre-authorization and reauthorization, and other TBS-specific compliance requirements.

Details describing the specific steps to Streamline TBS Administrative Requirements are provided in Appendix B.

Responsible Parties:
CDMH.

Time Line:
CDMH shall begin immediately noticing MHPs and other appropriate TBS stakeholders and complete this process by January, 2009.

Anticipated Results:
Streamlining of the CDMH TBS administrative process should have immediate positive impact on state administration and county TBS utilization by:
- Reducing overall administrative barriers to TBS;
- Freeing up state and county resources; and
- Increasing timely access to TBS by Emily Q. class members.

1   ***Point 2***: Clarify Criteria for TBS Eligibility

2

3   Purpose:  To develop standard criteria for TBS eligibility in two areas where there have

4   been past problems, so that these criteria will be consistently and uniformly applied

5   across the state.   These areas are limited to children and youth who are  "being

6   considered for" placement in an RCL 12 and above facility, and children and youth who

7   are "at risk of" hospitalization."

8

9   Steps:

10   •   CDMH shall officially publish and distribute the following language to the

11       counties and other TBS stakeholders, clarifying specific terms related to TBS

12       eligibility:

13           A child meets the requirements of "being considered for" placement in an

14           RCL 12 or above when an RCL 12 or above placement is **one option** (not

15           necessarily the only option) that is being considered as part of a set of possible

16           solutions to address the child's needs.  Additionally, whether or not an RCL

17           12 or above placement is available, a child meets the requirements when his or

18           her behavior could result in placement in such a facility if the facility were

19           actually available.

20           Similarly, a child meets the requirements of "at risk of" hospitalization in an

21           acute care psychiatric facility when hospitalization is **one option** (not

22           necessarily the only option) that is being considered as part of a set of possible

23           solutions to address the child's needs.  Additionally, whether or not

24           hospitalization in a psychiatric facility is available, a child meets the

25           requirements when his or her behavior could result in hospitalization in such a

26           facility if the facility were actually available.

27

28   Responsible Parties:

29   CDMH

30

31

7

1    <u>Time Line:</u>

2    CDMH shall officially notify all counties and other appropriate TBS stakeholders by

3    January 2009.

4

5    <u>Anticipated Results:</u>

6    This clarified language should produce immediate increases in the number of Emily Q

7    class members accessing TBS services as measured by:

8    • Increased uniformity in determining Emily Q class membership across the state;

9    • Increased county utilization of TBS;

10   • Improved and increased consistency in audits;

11   • Increased class member access to TBS; and

12   • Statewide policy uniformity.

13

14   *Point 3*: TBS Accountability Structure

15

16   <u>Purpose:</u> Develop a TBS accountability structure that addresses: 1) outcomes, 2) a

17   review process, and 3) utilization.

18

19   <u>Steps:</u>

20   • The TBS Accountability Structure requires that CDMH work with all county

21   MHPs through a continuous quality improvement process designed to increase

22   Emily Q class access to appropriate TBS services.

23

24   • The accountability principles are:

25   -A focus on practice and quality improvement rather than

26   compliance and disallowances, which have proven ineffective

27   -Achieving the greatest good for the greatest number of Emily Q class

28   members;

1      -Accountability to the class, the Court Order, and Medi-Cal requirements;

2      -Inter-agency collaboration;

3      -Key outcomes with best practices and measures;

4      -Information that is accessible, reliable, valid, meaningful, understandable,

5      and that have maximum value and utility to all stakeholders; and

6      -Involving family members in the accountability structure.

7

8      • The plan identifies core minimum data elements that document TBS access,

9      utilization, and behavioral and institutional risk.

10

11      • Accountability focuses on four key questions:

12      1. Are the children and youth in the county who are Emily Q class members and

13      who would benefit from TBS, getting TBS?

14      2. Are the children and youth who get TBS experiencing the intended benefits?

15      3. What alternatives to TBS are being provided in the county?

16      4. What can be done to improve the use of TBS and/or alternative behavioral

17      support services in the county?

18

19      • There are two levels in the TBS accountability process.  The Special Master will

20      assign MHPs to Level I or Level II, depending on several factors, such as size,

21      rural nature and TBS utilization. The Level 1 process requires MHPs to convene

22      two annual meetings – one open to the public and the other for stakeholders and

23      decision-makers – to review TBS data and discuss the four key TBS questions,

24      and to complete and deliver a brief findings report from the meetings to CDMH.

25      The Level II process is more intensive and demanding.

26

27      • Small and rural counties will be assigned to Level 1; 29 MHPs meet these criteria.

28      Medium and large counties that have demonstrated high performance in TBS

29      delivery, and counties that demonstrate to the Special Master that they offer

30      Emily Q class member's behavioral supports and services that are alternatives to

31      TBS will also be assigned to the Level I accountability process.

1

2  • The Special Master shall monitor TBS Utilization in small and rural counties.

3     Work group members anticipate that TBS utilization will increase as the full

4     benefits of this plan are experienced.   If this does not occur after a reasonable

5     period of time, the Special Master will convene a meeting with all parties to

6     consider options to address low TBS utilization.

7

8  • The remaining medium and large county MHPs will be assigned to a more

9     intensive Level II accountability process.  The MHPs will receive significant

10    support from an independent, statewide organization, funded through a contract

11    with CDMH.   The contracted organization will assist MHPs to develop and

12    implement TBS plans capable of rapidly increasing and sustaining TBS services

13    to Emily Q class members in these counties. The Special Master will select an

14    initial group of ten medium and large county MHPs to work intensively with

15    CDMH, the Special Master and the new CDMH contract group to increase TBS

16    utilization over the next 24 months.

17

18  • As medium and large county MHPs increase TBS utilization, they may request re-

19    assignment to the Level I accountability process

20

21  Responsible Parties:

22  CDMH and the Special Master

23

24  Time Line:

25  The TBS accountability process will begin in January 2009 and continue until December

26  31, 2010 at which time it is contemplated the Court would terminate jurisdiction.

27

28  It is expected that CDMH will provide additional support, administrative direction, and

29  graduated consequences for Level II counties to be determined in the exit criteria that will

30  be developed by January, 2009

31

1  Anticipated Results:
2  • Sufficient accountability structures will be in place to accurately and effectively
3    monitor all county MHPs and provide transparency and visibility to the Court and
4    all other stakeholders;
5  • Better data reporting and decision making;
6  • Increased and improved TBS in all counties.
7
8  For details of the TBS Accountability Plan, see Appendix C.

9  *Point 4*: Define TBS Best Practice to Promote Service Integrity

10

11  Purpose:  Appropriately define and operationalize Therapeutic Behavioral Services in
12  order to establish and/or maintain the fidelity of the service.

13

14  Steps:
15  CDMH will finalize and publish a comprehensive description of standard TBS services
16  spanning TBS assessment, service delivery and termination.  Elements of best practice
17  include:
18  • Service Philosophy;
19  • Cultural Competence;
20  • Components of TBS Service Delivery:
21    - Composition of the TBS Treatment Team
22    - Initial Meeting of the TBS Treatment Team
23    - Components of the TBS Plan
24    - TBS Initial Plan Implementation and Assessment Period
25    - Functional Behavior Assessment
26    - Development and Delivery of TBS Behavioral, Environmental, and
27      Relationship-Building Interventions
28  • TBS Supervision;
29  • Monthly TBS Review Meetings; and
30  • TBS Termination.

The TBS description will provide the foundation for CDMH to develop its TBS training plan along with training manuals for best practice and documentation.

Responsible Parties:
CDMH and its training contractor.

Time Line:
The TBS training process will be ready to implement by June, 2009.

Anticipated Results:
- More clarity at the county level about what is (and is not) TBS;
- Inform development of the training plan (Point 6);
- Inform development of the training manuals (Point 7);
- Inform the CDMH Policy Letter regarding TBS;
- Inform implementation of this TBS plan with regard to promoting best practices in TBS delivery.

For details of TBS Best Practice, see Appendix D.

*Point 5*: Create TBS Coordination of Care Process

Purpose:  Create a process to facilitate and ensure TBS coordination of care in the county mental health plans and among involved agencies, providers, families, and their supports.

Steps:
- Because significant numbers of Emily Q class members are the responsibility of and primarily served (or are at risk of service) through Child Welfare Services, Probation, and the Juvenile Court in addition to county Mental Health, coordination between these service and justice systems is essential to ensure full access to TBS among children and youth in the Emily Q class who could benefit from TBS.

1    • CDMH shall take the necessary actions with CDSS to promote interagency TBS

2      service, quality assurance and quality improvement, outreach, planning,

3      assessment, and service delivery, and to establish data-sharing agreements that

4      support data tracking and performance measurement at the state and county

5      levels.

6

7    • CDMH shall show leadership and initiative in establishing these state and county-

8      level interagency linkages and data sharing relationships.

9

10   • The goal of this effort is state and county-level engagement and interagency

11     coordination between Mental Health, Child Welfare Services, Juvenile Justice,

12     and the Court to promote TBS among eligible Emily Q class members served by

13     these local authorities that leads to appropriate TBS access and utilization within

14     the class.

15

16   Responsible Parties:

17   CDMH through interaction with California Department of Social Services (CDSS),

18   California Health and Human Services Agency (CHHSA), the Administrative Office of

19   the Courts   (AOC).

20

21   Time Line:

22   CDMH shall determine the scope and feasibility of data matching for the purpose of

23   quality assurance at the state and county levels by January, 2009.  CDMH shall officially

24   notice all counties and other appropriate TBS stakeholders with regard to data matching

25   arrangements by July, 2009.

26

27   Anticipated Results:

28   • Increased state- and county-level linkages and collaboration between Mental

29     Health, Child Welfare Services, Juvenile Justice, and the Juvenile Courts;

30

31

13

1

2 • A data-sharing framework that underpins structural accountability regarding

3 increased access to TBS for wards and dependents of the Court who are members

4 of the Emily Q class.

5

6 ***Point 6***: TBS Training

7

8 <u>Purpose:</u> Develop a TBS Training and Technical Assistance Plan.

9

10 <u>Steps:</u>

11 • CDMH shall establish a comprehensive training plan and process, most likely

12 through an RFP process with an established training organization. This training

13 plan will be informed and structured consistent with the work products described

14 in all other Points of this plan, and will cover both the TBS best practice and the

15 administrative and chart documentation necessary to satisfy compliance

16 requirements.

17

18 • The training contractor shall utilize a variety of adult learning models in the

19 training, such as learning conversations, academies, simulation, modeling,

20 coaching, on-line presentations, and other innovative learning methods.

21

22 • Parents/caretakers and youth are to be involved in development of training

23 modules and be included as part of the training team.

24

25 • CDMH shall provide regional trainings across the state annually for three years,

26 beginning in 2009.

27

28 • In addition to TBS service providers, CDMH and county staff responsible for

29 TBS policy and program audits will also receive this TBS training.

30

31

14

1    <u>Responsible Parties:</u>

2    CDMH and its training contractor.

3

4    <u>Time Line:</u>

5    The TBS Training program will be in place by July, 2009.

6

7    <u>Anticipated Results:</u>

8    • Expanded training statewide, increased county participation, better TBS,

9      increased compliance with program and fiscal audit requirements, and better child

10     results.

11

12    For details of the TBS Training, see Appendix E.

13

14    ***Point 7***: TBS Manuals

15

16    <u>Purpose:</u>  Develop TBS Training and Documentation Manuals.

17

18    <u>Steps:</u>

19    • CDMH shall, in coordination with the Training program described above,

20      develop, publish, and endorse written manuals and other media materials that

21      accompany the training effort (some through the contract provider and some

22      through CDMH policy or information notices).

23

24    • Develop a manual for chart documentation and audit procedures.

25

26    • Develop practice protocols as a way to disseminate the TBS Best Practice

27      description developed for Point 4, along with other training strategies.

28

29    <u>Responsible Parties:</u>

30    CDMH and its training contractor.

31

1    Time Line:

2    The TBS Manuals will be completed by July, 2009.

3

4    Anticipated Results:

5      •   Expanded training statewide, increased county participation, better TBS,

6        increased compliance with program and fiscal audit requirements, and better child

7        results.

8

9    *Point 8*: TBS Outreach

10

11    Purpose:  To develop a TBS outreach plan to reach all class members and those provider

12    organizations, and those agencies serving members of the class.

13

14    Steps:

15      •   Focus on reaching class members and those involved in helping class members

16        obtain services that are currently unknown to the MHPs.

17

18      •   Promote the dissemination of information regarding the availability of TBS and

19        how to access the service as class members.

20

21      •   Adopt an electronic information dissemination strategy; hire a contractor to

22        implement this "E" strategy to class members.

23

24      •   Partner with other organizations for electronic links and outreach.

25

26

27    Responsible Parties:

28    CDMH.

29

30    Time Line:

31    Begin implementation by May, 2009.

Anticipated Results:

- Increased TBS access and utilization statewide, and better child results.

For details of TBS Outreach, see Appendix F.

***Point 9***: Termination of Court Jurisdiction

Purpose:  To identify and clarify a structure and criteria that will ensure continuity and sustainability after court jurisdiction ends.

Steps:

- The Emily Q Work Group will meet between October 1 and December 31, 2008 to establish exit criteria.

- By January 1, 2009, the Special Master will make recommendations regarding the exit criteria that will release the State of California from Court jurisdiction, with an estimated date of December 31, 2010.

- The Emily Q Work Group recognizes that some Level II MHPs may continue to have low TBS utilization at the end of 24 months.  Discussion regarding exit criteria will include, but not be limited to:  (1) The Special Master establishing a TBS utilization rate for Level II MHPs that continue to be low-performing; and (2) Corrective measures the CDMH will require of MHPs provided in the state mental health managed care regulations for those same Level II MHPs.

- No later than October 1, 2010, the Special Master and all parties shall file a joint report with the Court with recommendations (if any) regarding exit.

Responsible Parties:

Special Master until termination of jurisdiction; CDMH thereafter.

Time Line:

Exit Criteria to be developed by December 31, 2008.

Anticipated Results:

Termination of jurisdiction and continued improvement in the provision of TBS.

**Special Master Recommendations:**

1. Adopt the Nine Point Settlement Implementation Plan as outlined in this report and Appendices A through F;

2. Extend Court jurisdiction through December 31, 2010;

3. Schedule a status conference in the next 30 days; and

4. The proposal for exit criteria shall be included in the next quarterly report due January 9, 2009.

In conclusion, it's been an extremely productive three months. Phase Three, Plan Implementation, will begin in January and at that time I once again look forward to a positive report to the Court. I have appreciated the challenges the Court has presented, and value the privilege to serve as your Special Master.

Dated: September 24, 2008                    Respectfully Submitted


                                             Richard Saletta, LCSW
                                             Special Master

**Appendices**

18

# APPENDIX A

## Emily Q Work Group Participants

California State Department of Department of Mental Health
- Mike Borunda, Assistant Deputy Director, Community Services Division (Left the Department of Mental Health on August 27, 2008)
- Sean Tracy, Chief, Strategic Planning - Department Lead (September 4, 2008-)
- Rita McCabe, Chief, Medi-Cal Mental Health Branch, Medi-Cal and Health Care Benefits
- Cynthia Rodriguez, Chief Counsel
- Barbara Zweig, Senior Staff Counsel

California State Department of Health Care Services
- Dina Gonzales, Chief, Medi-Cal Benefits Waiver Analysis and Rates
- John Krause, Chief Counsel, Legal Services

Representing the Class
- Melinda Bird, Senior Counsel, ACLU Foundation of Southern California
- Jim Preis, Executive Director, Mental Health Advocacy Services, Inc.
- JoeAnne Hust, Peer-to-Peer Support-Parent Services, Hathaway-Sycamores Child and Family Services
- Tom Sodergren, Practitioner, Assistant Director of Community Based Services, Casa Pacifica

California State Department of Justice, Office of the Attorney General
- Ismael Castro, Deputy Attorney General
- Melinda Vaughan, Deputy Attorney General

California Mental Health Director's Association
- Don Kingdon, Deputy Director
- Nancy Pena, President and Santa Clara County Mental Health Director

California State Department of Alcohol and Drug Programs
- Dave Neilsen, Deputy Director – Formerly Children's Mental Health Chief, State Department of Mental Health

## APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements
### 9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 1. | DMH shall inform Mental Health Plans (MHPs) that members of the class are eligible for TBS when other services are required and eligibility criteria are met and MHPs shall provide TBS in accordance with the plan. | Inform MHPs of their responsibility to provide services when class and eligibility criteria are met | DMH Information Notice 99-09 dated June 2, 1999 | **Eliminate this requirement:** This has been completed, and is no longer needed. | DMH to release to counti a new TBS administrativ requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |
| 2. | DHCS shall require MHP to submit report on how it intends to implement TBS within the MHPs county, and DHCS shall provide Plaintiff's counsel with copies of this letter. | Require MHPs to comply with the order. Ensured compliance through the protocol | DMH Letter 99-03 dated July 23, 1999 advised MHPs to submit plans by September 1, 1999. DMH Information Notice 01-02 dated May 16, 2001. | **Eliminate this requirement:** This has been completed. This was an early implementation tool, and is no longer needed. | DMH to release to counti a new TBS administrativ requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |

APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements
9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 3. | Defendant shall collect from each MHP forms approving and denying (NOAs) TBS and forward to Plaintiff's counsel on a quarterly basis beginning March 30, 2001 and ending March 30, 2004. | DMH to collect from MHPs notifications of service and denials (NOAs).<br><br>DMH to forward to Plaintiff on a quarterly basis.<br><br>DMH ensures compliance through the protocol review. | DMH Letter 99-03 dated July 23, 1999.<br><br>DMH Letter 01-03 dated August 8, 2001.<br><br>DMH Letter 01-04 dated August 8, 2001<br><br>DMH continues to send quarterly reports to plaintiff.<br><br>DMH protocol – Section B Authorization Regulation Section 1850.210 Provision of NOA | **Eliminate this Requirement:**<br><br>Class and State agreed that the data gathered in the quarterly report is not valuable. | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |
| 4. | DHCS shall require that each MHP ensures class members have access to TBS when the requirements of DMH Letter 99–03 are met. | DMH to inform MHPs of requirement and monitor for compliance. | DMH Letter 99-03 dated July 23, 1999<br><br>DMH Protocol –Access, Section A & TBS Section N | **Eliminate Requirement**<br><br>CMHDA requested that if this requirement is retained it be included in MHP contracts or in regulations to clearly establish what is required of counties. | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |

APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements
9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 5. | Defendant shall provide general EPSDT information to heads of Medi-Cal beneficiary households with members under 21. This notice shall be provided when Medi-Cal benefits are approved or when Medi-Cal identification card is issued, and annually thereafter. Shall begin providing notice no later than 90 days after this Permanent Injunction. | DMH /DHCS to develop, provide and require distribution of notices.  DMH ensures compliance through the protocol. | DMH All county director's letter dated May 25, 2001.  DMH Letter 01-07 dated November 16, 2001 included EPSDT and TBS required notices.  DMH Protocol – Access Section A and TBS Section N. | **Maintain Requirement.**  This requirement provides easily accessible information to clients and is of minimal cost.  However it was noted that TBS information is a small part of a thick packet; recipients may not notice TBS information. | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009.  Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |
| 6. | Defendant shall send the above mentioned EPSDT informational notice and notice describing TBS to all children on Medi-Cal under 21 at admittance to Metro and Napa state hospitals and whenever these hospitals are informed a child is being considered for admission. Defendant has 120 days to comply. | DMH to provide notices to children/youth under 21 at admittance to Metro and Napa State Hospitals and advise MHPs of their responsibility to do the same when involved in a placement. | DMH Letter 01-03 dated August 8, 2001.  DMH Letter 01-07 dated November 16, 2001 | **Maintain Requirement.**  State Hospitals provide this information to class eligible members.  Reported as not burdensome and effective for outreach.  DMH has researched the number of youth age 18-21 in State Hospitals: as of July 2008, there were approximately 16 youth at Metropolitan, 7 at Napa, who were not CYA detained.  (Those youth who are forensic patients are not Medi-Cal eligible.) | DMH will continue to ensure that this process i in place at state hospitals |

**APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements**

**9-24-08**

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 7. | Defendant shall make the necessary arrangements to assure TBS notice and general EPSDT information notice is given to all children on Medi-Cal under 21 at time of emergency psychiatric hospitalization, admission to IMD in California, or any RCL 12 (when MHPs are involved in the placement), 13, or 14. Defendant has 120 days to comply. | DMH to provide direction to MHPs and monitor for compliance | DMH Letter 01-03 dated August 8, 2001.<br><br>DMH Letter 01-07 dated November 16, 2001.<br><br>DMH Protocol – Access Section A and TBS Section N. | **Maintain Requirement.**<br><br>Consensus was to identify the level of burden. If the burden is high, the requirement should be simplified. If not, retain the requirement.<br><br>CMHDA will explore how burdensome this requirement is to counties. | DMH to release to counties a new TBS administrative requirements Information Notice by December 1, 2008, with implementation target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |
| 8. | Defendant shall issue a directive listing the mental health services which have been or may be covered as an EPSDT supplemental mental health service or provide information about the procedure of obtaining coverage and distribute to all MHPs. Defendant has 90 days to comply. | DMH provided guidance to MHPs | DMH Letter 01-04 dated August 8, 2001. | **Eliminate Requirement.**<br><br>This task was a requirement of early implementation, and has been completed. | DMH to release to counties a new TBS administrative requirements Information Notice by December 1, 2008, with implementation target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |

## APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements
### 9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 9. | Defendant shall adopt and implement procedures to ensure that prior to placement in Metro or Napa state hospital, RCL 12 (when MHPs are involved in the placement), 13, or 14, or an IMD a form shall be completed by mental health practitioner certifying consideration for TBS and reason(s) for denying and/or not providing TBS (except when children are committed by order of a court). | DMH provided guidance to MHPS on certification requirements, qualified providers and distribution of certification documents. | DMH Letter 01-03 dated August 8, 2001 | **Eliminate Requirement.**<br><br>Class stated that the certification is not helpful; the requirement has evolved into an administrative barrier with little benefit.<br><br>DMH has researched the number of youth age 18-21 in State Hospitals. As of July, 2008, there were approximately 16 youth at Metropolitan, 7 at Napa, who were not CYA –detained. (Those youth who are forensic patients are not Medi-Cal eligible.) Note that this number varies weekly. | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009.  Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services.. |
| 10. | Defendant shall retain at least 1 mental health care practitioner to be available to prepare an assessment of each class member placed at Metro or Napa state hospital for 3 months or more. The parties shall identify a mutually agreeable practitioner within 30 days. | *Agreement between State and PAI attorneys was reached August 1, 2001.  Los Angeles County MHP has been authorized to proceed with assessments. PAI will be proposing practitioners to be teamed with practitioners selected by other MHPs, subject to State approval. Assessments should be completed by November 6, 2001.* | | **Eliminate Requirement.**<br><br>This task was a requirement that is outdated. | None |

**APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements**
**9-24-08**

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/8/08 | Implementation Plan |
|---|---|---|---|---|---|
| 11. | Defendant shall provide TBS as a transition for children/youth in state hospitals when: medically necessary; and when TBS is not duplicative of other Medi-Cal services; and if Defendant's existing procedures can be modified to entitle members of the class to receive federal Medicaid reimbursement. | *DMH will be working with DHCS to explore options.* | | Related to #8; will be addressed together.<br><br>DMH has researched the number of youth age 18-21 in State Hospitals: as of July 2008, there were approximately 16 youth at Metropolitan, 7 at Napa, who were not CYA –detained. (Those youth who are forensic patients are not Medi-Cal eligible.) Note that this number varies weekly | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |
| 12. | Defendant shall ensure that compensatory TBS is provided to all class members who were entitled to receive TBS, but did not, for a period beginning 1 year prior to the filing of this lawsuit on May 27, 1998. | Develop procedures to ensure that compensatory TBS is provided when required. | DMH provided preliminary information about compensatory TBS in it's May 25, 2001 letter to all county mental health directors. | Eliminate Requirement.<br><br>This item has been eliminated through a previous settlement. | None |
| 13. | Defendants shall ensure class members have access to TBS within their respective MHPs. Defendant shall require each MHP with at least 1 class member to provide a list to DMH of TBS providers or provider within the MHP. Defendant shall ensure the MHP expands its provider network for that MHP to meet its obligations to TBS class members in its jurisdiction. If necessary, Defendant shall assist the | DMH to ensure that MHPs provide access to TBS services to all class members with their respective MHPs. | DMH all county mental health director's letter dated May 25, 2001.<br><br>DMH Information Notice 00-03 dated June 23, 2000 requires MHPs to have a toll free number staffed with a person knowledgeable about TBS.<br><br>DMH maintains a listing of TBS providers in each county and posts the list | Maintain Requirement:<br><br>CMHDA and DMH agreed that it is not burdensome to provide a list of providers. Counties could provide the lists annually to DMH which could post it on the internet.<br><br>Class noted that the geographical distribution of providers and capacity is important, especially for out of county placements. Capacity may need to be increased in certain areas, but not for others. | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |

## APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements
## 9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| | MHPs to compile a list of providers qualified, willing and logistically capable of providing TBS to children within the area served by each MHP. | | on its website. DMH requests updated information from MHPs annually and updates the list. | CMHDA pointed out, that county requirements should be included in MHP contracts or regulations. | |
| | | | DMH monitors to ensure compliance through the protocol – Access, Section A. | | |
| | | | MHP contract, Exhibit A, Attachment 1 requires that MHPs arrange for/provide services to children residing out of county. | | |
| 14. | Defendant shall require MHPs to provide all forms certifying TBS consideration and deemed inappropriate for class members prior to placement in Metro and Napa state hospital, RCL 12 or higher, and Defendant shall forward copies to Plaintiff's counsel quarterly beginning March 30, 2001 and ending March 30, 2004. | DMH to collect forms certifying TBS consideration from MHPs and forward on quarterly basis to plaintiffs counsel. | DMH Letter 01-04 dated August 8, 2001. | **Eliminate Requirement.** This has been completed and is no longer required. | None |
| | | | DMH requires that MHPs submit notifications, certifications, NOAs and fourth authorizations to the department. | | |
| | | | DMH compiles quarterly reports and forwards them to plaintiffs counsel. | | |

## APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements 9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 15. | Defendant shall require MHPs to provide updated lists of local mental health providers and Defendant shall forward this to Plaintiff's counsel quarterly beginning March 30, 2001 and ending March 30, 2004. | DMH to obtain updated lists of mental health providers and forward to Plaintiff counsel. | DMH all county mental health Director's letter dated May 25, 2001. DMH required MHPs to provide DMH with updated lists quarterly. DMH currently requests the information annually and maintains a list on the DMH website. | Eliminate Requirement.<br><br>(This is included in requirement #16.) | |
| 16. | Defendant shall forward lists of training provided to MHPs by DMH or CIMH, to Plaintiff's counsel quarterly beginning March 30, 2001 and ending March 30, 2004. | DMH and CIMH have been and will continue to be responsible for this reporting requirement. | Training contract with CIMH. | Eliminate Requirement. | DMH to remove this item from Medi-Cal review protocols, effective 1/1/2009. |
| 17. | Defendant shall take appropriate corrective measures with regard to MHPs where either no class members or a disproportionately low number of class members have been approved for TBS. | DMH is currently monitoring the provision of TBS using on-going TBS notifications received from the MHPs. | DMH Policy staff review data and certification and notification forms for changes in TBS utilization. When changes or disproportionately low number of class members are noted the information is forwarded to DMH County Operations Technical Support Staff for follow-up.<br><br>DMH Compliance and Oversight through the protocol will cite areas of non-compliance and refer the MHP for technical assistance. Referred for technical assistance is provided. | This is a compliance issue, not an administrative requirement. | This is being addressed I Task Group #3 (Accountability Structure). |

APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements

9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| Administrative Barriers Committee – New 6/24/08 | | | | | |
| 18 | **MHP pre-authorization, authorization and re-authorization requirements.** | | **MHP Contract.** | **Eliminate Requirement.**<br><br>State authorization requirement will be eliminated. | DMH to release to counti a new TBS administrativ requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |
| | | | | | DMH to remove this item from Medi-Cal review protocols, effective 1/1/2009. |
| | | | | | DMH to remove requirements from MHP contract requirements which will be revised and provided to MHP's by 1/1/09. Revisions will be effective 7/1/09 or when executed, whichever is later. |
| 19 | **10 county TBS focused reviews and corrective action plans.** | **DMH requires 10 specified counties to submit an annual corrective action plan.** | **Corrective Action Plans** | **Eliminate Requirement.** | DMH will eliminate the monitoring of the 10 corrective action plans. |

APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements
9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 20 | **Compliance Review Protocol – authorization items.** | **DMH TBS Information Notice.** | Compliance Protocol | **Eliminate Requirement.** Consensus was to remove the authorization items from the compliance protocols. | DMH to remove this item from Medi-Cal review protocols, effective 1/1/2009. |
| 21 | **Compliance Review Protocol – additional requirements** | DMH TBS Information Notice. | Compliance Protocol | Revise contract, regulations, and compliance protocol to reflect changes/recommendations. | DMH to release to counsel a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. DMH to revise Medi-Cal review protocols effective 1/1/09. Contract will be revised and provided to MHPs by 1/1/09; will be effective 7/1/09, or when executed whichever is later. |

## APPENDIX B -- Point 1: Streamline the TBS Administrative Requirements
## 9-24-08

| | Court Requirement | DMH Requirement | Operational Mechanism | Administrative Barriers Committee Recommendations 7/9/08 | Implementation Plan |
|---|---|---|---|---|---|
| 22 | Create audit exemption for the first 30 days of TBS services for assessment. | DMH TBS Information Notice. | | Create audit exemption for the first 30 days of TBS services for assessment. | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. DMH to include the exception in the audit protocols. |
| 23 | DMH Policy Letter | | | Issue DMH TBS letter that clarifies all current policy and requirements, supersedes old. | DMH to release to counti a new TBS administrative requirements Information Notice by December 1, 2008, with implementatio target date of January 1, 2009. Notice will be written to clarify and eliminate some administrative requirements to support MHP commitment to enhanced access for quality TBS services. |

**APPENDIX C**

**TBS Accountability Structure**
September 23, 2008

Purpose Statement and Overview of the TBS Accountability Structure

The purpose of the Therapeutic Behavioral Services (TBS) Accountability Structure is to identify and develop a statewide practice and performance improvement structure. This structure will include outcome and utilization measures and a continuous quality improvement process that will allow the California State Department of Mental Health (CDMH) to effectively ensure that TBS are accessible, effective, and sustained for the Emily Q class members as outlined in the Court-approved TBS Plan.

The accountability structure, to be implemented by CDMH, will be accomplished through annual reports submitted by the county Mental Health Plans (MHPs). The new *TBS Annual Review Report* utilizes a quality improvement process based on principles and accountability activities that focus on practice and service coordination, rather than compliance and disallowances, which have proven ineffective; designed to increase Emily Q class access to appropriate TBS services. This approach requires an interagency review of relevant data in response to four questions, utilizing a standard report format, developed by CDMH in collaboration with the California Mental Health Directors Association (CMHDA). The four questions to be addressed in the annual report are:

1. Are the children and youth in the county who are Emily Q class members and who would benefit from TBS, getting TBS?
2. Are the children and youth who get TBS experiencing the intended benefits?
3. What alternatives to TBS are being provided in the county?
4. What can be done to improve the use of TBS and/or alternative behavioral support services in the county?

Guiding Principles and Strategies for the TBS Accountability Structure

A. The CDMH efforts to improve TBS implementation shall emphasize a continuous quality improvement approach, incorporating a "practice and system improvement" focus rather than reviews (a term that carries connotations of compliance).

B. A practice and system improvement approach will emphasize the greatest opportunity to achieve the greatest good for the greatest number of Emily Q class members.

C. The quality improvement approach will build on existing principles of interagency collaboration and resource coordination for our most vulnerable children and youth, community partnerships, family- and youth-driven services, transparency, and on the comprehensive outcomes identified as priorities by CMHDA, CDMH, the Mental Health Services Act Oversight and Accountability Commission, and the California Child Welfare Council.

D. This approach maximizes accountability to the Emily Q Class, the Court Order, and the Medi-Cal program. This in turn will ensure class members access to care, and will allow for county-specific consideration of a broad spectrum of services to address the needs of the class.

E. Under this approach, CDMH effort shall pay particular attention to members of the Emily Q class who have not in the past or who are not currently receiving TBS.

F. CDMH efforts between now and the time that jurisdiction ends shall focus on a manageable number of MHPs with disproportionately low utilization.

G. The accountability structure will specify key outcome areas and utilizes a data dashboard with a limited number of measures. These have been selected to reflect the best qualitative and quantitative measures of change in key outcome areas.

H. This approach selects information (qualitative and quantitative data) and methods/processes that are accessible, reliable, valid, meaningful, and understandable, and that have maximum value and utility to all stakeholders.

I. By adopting a continuous quality improvement approach at all levels, CDMH has agreed to include family members as staff, evaluators, and/or decision-makers.

The Court, directed the Special Master to set a TBS utilization rate as a remedy to increase access to and utilization of TBS by members of the Emily Q class. Although this is still a possibility in the future, the present accountability structure does not include a minimum TBS utilization rate. Through the planning effort that produced this proposed TBS plan, the parties agreed that the accountability structure proposed below – along with the other elements of the proposed TBS Nine Point Plan – is likely to significantly increase TBS utilization and that a TBS utilization rate may not be necessary.

The Emily Q Work Group recognizes that some Level II MHPs may continue to have low utilization at the time the court terminates jurisdiction on December 31, 2010, and is committed to developing a plan for exit criteria by January 1, 2009. In the Special Master's January 1, 2009 quarterly report, the Special Master will make recommendations regarding the exit criteria, based on the plan developed by the Work Group. Discussions regarding continuation of a practice improvement approach, along with graduated consequences will be addressed in the exit criteria. The exit criteria discussions will include, but not be limited to: (1) The Special Master establishing a TBS utilization rate for Level II MHPs that continue to be low-performing; and (2) corrective measures CDMH will require of MHPs provided in the state mental health managed care regulations for those same Level II MHPs.

TBS Accountability Structure

Consistent with these principles, CDMH will implement the Emily Q Accountability Structure through a statewide stakeholder discussions with the MHPs. This accountability structure will require use of data provided by the CDMH and the California Department of Social Services as well as from local agency records and resources, analyze these qualitative and quantitative data and reports, and make local service delivery decisions through a multi-agency process. There will of necessity be some administrative and fiscal impact on every county, which will be

ameliorated as much as possible through a range of technical assistance from CDMH, and by claiming Federal Financial Participation revenues for quality improvement/quality assurance and utilization review activities. The goal of this local/state accountability relationship will be to make the best possible local and state decisions in order to maximize system improvement and access to TBS.

This proposed data accountability plan begins by describing the core minimum set of data elements – a "data dashboard" – needed to support comprehensive multi-agency decision-making and planning at the local level. Several of these data elements are currently available, while others will require data-sharing agreements between various state agencies that will have to be established as the accountability plan is implemented. This plan proposal also includes brief discussion of the local accountability structure, its necessary membership, and problem-solving measures that may be needed to ensure county participation and compliance with the Court order.

Core minimum TBS data elements

***Access***
One critical element of TBS delivery and accountability is the ability of children and youth in the Emily Q class to access TBS services. The following summarizes key data elements needed to account for access to TBS.

- Total number of children and youth receiving TBS.
- Total TBS divided by total number of children and youth eligible for EPSDT.
- Total TBS divided by total number of EPSDT children and youth who are receiving Mental Health services.
- Total TBS divided by the total number of children and youth placed in RCL 12+ plus the total number of children and youth placed in a psychiatric hospital during the past 24 months.
- Total number of children and youth receiving Mental Health services with a foster care aide code divided by total number of children and youth with a foster care aide code eligible for EPSDT.

This access analysis will rely on multi-agency statistical data (Mental Health, Child Welfare Services, and Probation) both aggregated and individualized for the following:
- Children and youth hospitalized in the past 24 months.
- Children and youth who receive RCL 12 and above placement.
- Children and youth who receive RCL 12 and above placement and who also receive mental health services (including TBS).

*Purpose: To track and review TBS "rates" and increase access to TBS*

***Utilization***
A second critical element of TBS delivery and accountability is the way TBS is utilized by the

counties.  The following summarizes key data elements needed to account for TBS utilization.

- TBS units billed (days, minutes, contacts, etc.) averaged per child.
- TBS episodes (duration, number per year) averaged per child.

*Purpose: To track and review TBS use and costs by county*

### Behavioral and Institutional Risk Reduction

A third critical element of TBS delivery and accountability is the extent to which TBS reduces child behavioral risk and institutional risk.  The following summarizes key data elements needed to account for behavioral and institutional risk reduction.

1. Among children and youth who receive TBS, compare their emergency psychiatric hospitalization before TBS with their emergency psychiatric hospitalization after TBS.
2. Among children and youth who receive TBS, compare their RCL placements by level, frequency and length of stay before TBS with their RCL placements after TBS.
3. Among children and youth who receive TBS, compare their unplanned emergency services before TBS with their unplanned emergency services after TBS.

*Purpose:  Reduce behavioral and emotional risk, and decrease the frequency and duration of utilization of emergency, inpatient, and RCL 12 and above placements*

These three critical elements of TBS delivery and accountability represent the core basic set of data needed to support the on-going TBS accountability process that will be conducted by key stakeholders in each county.  The data elements summarized above will require thoughtful county-level review in the context of both the Emily Q settlement and other important factors specific to each county in order to improve TBS at the county and state levels.

These data dashboard measures – along with other possible additional measures – will be developed and refined before January 2009 and may continue to be refined throughout the TBS plan implementation period subject to the need for improved data.

TBS Quality Improvement Approach

CDMH shall be responsible for ensuring and improving access to and the quality of TBS services to members of the Emily Q class.  CDMH will require all 56 county MHPs to participate in the continuous quality improvement process.  The MHPs will be broken out into two groups with the majority of MHPs in Level I and the remaining medium and large low-performing MHPs in Level II.  Level I will involve a minimal number of simple, doable, and sustainable tasks.  Level II MHPs will require considerable effort on the part of these MHPs to fulfill the accountability requirements.  The MHPs will receive significant support from an independent, statewide organization, newly funded through a contract with CDMH.  Contractor activities will include, but are not limited to data analysis, case review, developing practice improvement objectives and meeting facilitation. The contracted organization will assist MHPs to develop and implement TBS plans capable of rapidly increasing and sustaining TBS services to Emily Q class members in these counties.

The Special Master will assign MHPs to Level 1 depending on size, rural nature and TBS utilization. Small and rural counties will be assigned to Level 1 (Note: although the 29 small and small/rural counties cover a large geographic portion of California, their populations are

relatively small and include only about five percent of the Emily Q class members.) Counties that have demonstrated high performance in TBS delivery, and counties that demonstrate to the Special Master that they offer Emily Q class members behavioral supports and services that are alternatives to TBS will also be assigned to the Level I accountability process.

The Special Master shall assign medium and large counties that are disproportionately low in providing TBS to children and youth in the Emily Q class to Level II.

### Level I Accountability Structure:  TBS Practice Accountability

CDMH shall require the following of all Level I MHPs from January, 2009 through December 31, 2010:

- The county Mental Health Director or his/her designee with appropriate authority will convene two TBS meeting per year, lasting a minimum of two hours each, to review the core TBS data elements in the "data dashboard" provided by CDMH, and to discuss following four TBS questions:

    1. Are the children and youth in the county who are Emily Q class members and who would benefit from TBS, getting TBS?
    2. Are the children and youth who get TBS experiencing the intended benefits?
    3. What alternatives to TBS are being provided in the county?
    4. What can be done to improve the use of TBS and/or alternative behavioral support services in the county?

- One of the meetings will be a general forum open to the public.  The MHP will publish a general notice of the meeting.  The following stakeholders and interested parties will be especially invited to the public forum:

    - Public agency staff and volunteers providing mental health or related services.
    - Contract mental health agency staff and volunteers, including all TBS providers.
    - Education providers.
    - Parents and youth.
    - Group home providers and foster parents.
    - Officers of the Court involved in juvenile matters
    - Attorneys practicing in delinquency and dependency court.
    - Members of the faith community and other volunteer organizations.

- The other meeting will include the following stakeholders and county representatives or their designees with appropriate authority:

    - Child Welfare Services Director.
    - Chief Probation Officer or Deputy Chief of Juvenile Probation.
    - Presiding Judge of the Juvenile Court.
    - County Office of Education Special Education Director.
    - Parent/Child Advocate Representatives.
    - Local TBS Provider Representatives.

- The order or sequence of these meetings is at the discretion of the county Mental Health Director.
- Following the TBS meetings, the County Mental Health Director will complete a simple (no more than three pages) summary report developed by CDMH. This summary report will include:

  - Names of the participants who attended the meetings.
  - A brief summary of answers to the four questions.

- This TBS meeting summary report will be sent to CDMH as an advisory notice of the county's efforts in implementing TBS services and will not be binding on the county; rather, this advisory report will describe steps the county intends to take in "good faith" to ensure the best possible access to and use of TBS by members of the Emily Q class. CDMH will use the MHP summary report to support continuous improvement and transparency (regarding TBS) including updating best practices, updating training strategies to improve performance, and providing public accountability.

This Level I accountability process is intended to encourage all county MHPs to take a thoughtful and informed look at TBS services to Emily Q class members in their county, consider ways to improve those services, and take action to increase access to and utilization of TBS by class members. This Level I process is not onerous, nor will it impose unusual costs on the county. Nonetheless, this modest effort has high potential to improve current service conditions throughout California that are marked by limited access to and underutilization of TBS among Emily Q class members. In combination with the other important elements of this TBS plan – streamlined administration, clarified eligibility, best practices in service delivery, interagency coordination and data sharing, training, and outreach – this best approach to local TBS accountability will increase transparency (regarding TBS) statewide regarding TBS services and, in the majority of counties, this approach is likely to contribute to improved TBS services for Emily Q class members.

If county MHPs engage in this Level I process in good faith, and in a spirit of providing TBS to Emily Q class members have been found entitled to receive, it is anticipated that class members will experience significant improvement in accessing TBS and in achieving the intended outcomes of TBS. Annual completion of the Level I process described above will fulfill the TBS accountability requirements for the majority of counties.

The Special Master shall monitor Small and Small rural county TBS Utilization. An increase in TBS utilization is expected as the full benefits of this plan are experienced. If after a reasonable period of time, problems continue with no increase in utilization, the Special Master will convene meeting with all parties to the lawsuit to consider options to address low TBS utilization.

### *Level II Accountability Structure:  TBS Improvement Accountability*

The Level II TBS accountability process will be based on the same elements as Level I – data

review, learning conversatons, interagency coordination, transparency, and county-state cooperation. However, Level II will supersede the Level I requirements and add considerable effort, attention, and support to deep analysis and problem solving, focused interagency efforts to increase Emily Q class member access to appropriate TBS, continuous improvement of local efforts, and a sustainable approach to appropriate Emily Q class access to TBS. To accomplish this ambitious accountability effort, CDMH will contract with an independent organization that is familiar with mental health and associated services delivery in California's counties and that has the capacity for data analysis, performance and practice improvement strategies, and facilitation of a continuous quality improvement processes in the public sector.

The intent of the Level II TBS accountability process is to increase access to, utilization of, and delivery of TBS among Emily Q class members. In this regard, the Level II process will be a doable, sustainable, meaningful and potentially effective approach to increasing TBS utilization.

The Special Master will assign medium and large counties that have disproportionately low numbers of Emily Q class members receiving TBS to the more intensive Level II accountability process.

***Phase One***

In Phase One, which begins in January, 2009, and continues through December, 2010. During this period of time the Special Master will select ten Level II MHPs to engage in an intensive practice improvement process.

Phase One
Of the Level II MHPs, the Special Master will recommend ten counties for Phase One based on several criteria, including the following:

1. A disproportionately low number of Emily Q class members currently receiving TBS,
2. A disproportionately low ratio of EPSDT eligible children and youth accessing mental health services,
3. A disproportionately low ratio of EPSDT eligible children and youth who are placed in foster care group homes but are not receiving mental health services,
4. Disproportionately high numbers of children and youth placed in RCL 12 or higher foster care group homes,
5. Total number of children and youth receiving Mental Health services with a foster care aide code divided by total number of children and youth with a foster care aide code eligible for EPSDT,
6. Readiness for improvement,
7. Inability to demonstrate that Emily Q class members in their county are receiving alternative behavioral supports and services through some other type of service, and/or
8. The greatest opportunity to achieve the greatest good for the greatest number of Emily Q class members.

The intent is to select and assist ten counties that represent the greatest opportunity to achieve significant increases and improvement in TBS delivery to the greatest number of Emily Q Class members not presently receiving services as rapidly as possible. Although the majority of counties are exempt from this Level II requirement, the Special Master may consider including a limited number of Level I MHPs that volunteer for Level II Phase One accountability assistance

if their inclusion offers the opportunity to rapidly increase TBS to Emily Q class members not presently receiving services. However, the priority will be to include counties that are considered under-performing with regard to TBS among Emily Q class members.

Start-up for the Phase One MHPs will be scheduled by the Special Master, with the first MHP beginning Level II in January 2009 followed by one additional MHP per month until all ten MHPs have implemented Level II. CDMH's independent contract provider will maintain the Level II Phase One effort until December 31, 2010, by which time it is expected that the ten Level II counties will have achieved significant increases in Emily Q class member access to TBS and will be sustaining an appropriate level of TBS services for class members in their respective county. Level II counties that achieve an appropriate level of TBS access and services prior to December 31, 2010 may request permission from the Special Master to step down from Level II to Level I, subject to the county's ability to demonstrate that achieved success will be sustained.

Level II counties not selected in Phase One and the more intensive practice improvement effort will continue using Level I requirements to improve TBS access and utilization.

Phase One Accountability - Two Discussion Groups
The Level II accountability discussions will follow the same basic format as the Level I discussions, except that they will delve much deeper into quantitative and qualitative data regarding TBS in the county. These discussions will focus on the four key TBS questions:

1. Are the children and youth in the county who are Emily Q class members and who would benefit from TBS, getting TBS?
2. Are the children and youth who get TBS experiencing the intended benefits
3. What alternatives to TBS are being provided in the county?
4. What can be done to improve the use of TBS and/or alternative behavioral support services in the county?

The Level II discussions will occur within two different groups in the county. One discussion group will include practitioner-level staff from Mental Health, Child Welfare Services, and Probation involved in the day-to-day delivery of TBS, along with parent and provider representatives, youth, and others with hands-on knowledge of TBS delivery. Their task, supported by intensive technical assistance and support from the contractor provided by CDMH, will be to review and analyze the data dashboard information supplied by CDMH, including cross-agency data from Mental Health, Child Welfare, and Juvenile Justice; review qualitative findings collected through case studies of a sample set of local TBS cases; and review case studies of local children and youth in the Emily Q class who have not received TBS.

The Parent/Practitioner/Provider-level group members will review and discuss this broad array of information for the purpose of better understanding the dynamics of TBS in their county, with a primary focus on Emily Q class members who do not receive TBS. The contractor will prepare a summary of for presentation to the second Level II group, county decision-makers, and their partner representatives will compile findings and conclusions from this Parent/Practitioner/Provider-level group.

The second discussion group will include county decision-makers including the Director of Mental Health, the Director of Child Welfare Services, the Chief Probation Officer, the Presiding Judge of the Juvenile Court, a parent representative, and a TBS provider representative; other interested key stakeholders will also be encouraged to participate. These Decision-Maker discussions will follow the four key TBS questions, using data provided by CDMH along with locally generated findings developed through the Parent/Practitioner/Provider discussion group. The purpose of this Decision-Maker meeting will be to review the information provided by CDMH and the Parent/Practitioner/Provider group, to discuss and answer the four key TBS accountability questions, and to develop strategies to increase and improve TBS to Emily Q class members in the county.

The purpose of these two discussions will be to delve down into and resolve underlying agency and systemic barriers to TBS that prevent children and youth in the Emily Q class from receiving services to which they are entitled. As such, these discussions will be labor intensive and will have significant impact on the county MHPs – their intended purpose is to correct practices that have resulted in low levels of TBS delivery in the county, and replace them with doable and sustainable strategies for MHPs to increase TBS access and delivery in the county. CDMH will provide intensive support through the contractor to facilitate the discussions. CDMH will use the Level II process to motivate the MHPs to increase and improve TBS to Emily Q class members as quickly as possible, and CDMH will be responsible for maintaining MHP compliance with this accountability effort.

Following the Decision-Maker accountability meetings, the contractor will work with the county Mental Health Director to complete a report of key findings and recommended strategies to increase and improve TBS access and delivery in the county. It is anticipated that these county MHPs will be able to increase TBS as their efforts are reinforced by other elements of the TBS Nine-Point Plan, including streamlined administration, clarified eligibility, best practices documentation, interagency coordination, training, TBS manuals, and outreach.

Phase One – Getting Started
CDMH will ensure that within one month the MHP will convene an orientation and focus meeting that includes members from discussion groups, the parent/practitioners/providers and the decision-makers. This orientation meeting will be supported and facilitated by the contractor. The purpose of this orientation meeting is to introduce all the parties to the Level II process, respond to questions and concerns the participants have regarding the effort and expectations, and launch the Level II accountability process.

Phase One – Ongoing
Following the orientation meeting, CDMH will require all Phase One county MHPs to continue the TBS accountability process, with both the Parent/Practitioner/Provider group and the decision-maker group meeting semiannually until such time as the Level II counties increase their TBS access and delivery to levels that are satisfactory to the Special Master. Once these increases have been achieved, counties will be allowed to suspend or modify their Level II efforts, depending on the type and amount of improvement achieved, and step down to the Level I accountability process. CDMH shall maintain contractor assistance to the county MHPs still participating in the Level II effort until December 31, 2010.

Contractor Selection

The contractor shall be an independent organization that is familiar with mental health and associated services delivery in California's counties and that has the capacity for data analysis, performance and practice improvement strategies, and facilitation of a quality improvement processes in the public sector.

The contractor shall demonstrate understanding of the importance of family- and youth-driven services, and shall contract with or employ family and youth, and include family members and youth at all levels, as staff, evaluators, and/or decision-makers.
The contractor shall collaborate with existing statewide or local Family and Youth organizations to identify possible family members or youth who would be excellent candidates for participating in the practice improvement effort.

The contractor shall support the Level II TBS accountability counties by assisting with planning and problem solving, and by facilitating meetings and learning conversations with critical stakeholders, local officials, providers, family members, and youth. The contractor shall offer expert assistance with data analysis and interpretation of findings, assist with reporting requirements, and promote transparency among the counties and between the counties, CDMH, and other stakeholders to ensure the best results for members of the Emily Q class.

Alternative Accountability Structures
Because this Phase One TBS accountability process is similar in some regards to the Performance Improvement Program (PIP) effort currently required of counties, CDMH will consider Phase One county requests to incorporate the Level II effort into a PIP in order to reduce or avoid a duplication of effort. And because TBS spans multiple county agencies, other county interagency efforts similar to the mental health PIP will also be considered as vehicles for implementing the Phase One accountability process, so long as the basic Phase One TBS accountability elements are incorporated into the program.

Timeline
The TBS accountability process will begin in January 2009 and continue until December 31, 2010 at which time it is contemplated the Court would terminate jurisdiction.

The Emily Q Work Group recognizes that some Level II MHPs may continue to have low utilization at the time the court terminates jurisdiction on December 31, 2010, and is committed to developing a plan for exit criteria by January 1, 2009. In the Special Master's January 1, 2009 quarterly report, the Special Master will make recommendations regarding the exit criteria, based on the plan developed by the Work Group." Discussions regarding continuation of a practice improvement approach, along with graduated consequences will be addressed in the exit criteria. The exit criteria discussions will include, but not be limited to: (1) The Special Master establishing a TBS utilization rate for Level II MHPs that continue to be low-performing; and (2) corrective measures CDMH will require of MHPs provided in the state mental health managed care regulations for those same Level II MHPs.

*Purpose: To continuously improve TBS services in every county*

*Conclusion*

This TBS Accountability Plan as described above is intended to make the best-combined use of local county control and statewide accountability to ensure the continuous improvement of TBS in every county throughout the state.  The overarching goal is to ensure that children and youth whose needs are consistent with the criteria for eligibility in the Emily Q class receive the behavioral supports and services they need in order to achieve the best possible outcomes for themselves and their families.

**APPENDIX D**
**Point 4: TBS Best Practices**

**Therapeutic Behavioral Services**

**Therapeutic Behavioral Services (TBS)** is a one-to-one behavioral mental health service available to children/youth with serious emotional challenges and their families, who are under 21 years old and have full-scope Medi-Cal. TBS is never a primary therapeutic intervention. It is always used in conjunction with a primary mental health service. TBS is available for children/youth who meet the requirements of being considered for placement in an RCL 12 or above (whether or not an RCL 12 or above placement is available) or who meet the requirements of at risk of hospitalization in an acute care psychiatric facility (whether or not the psychiatric facility is available). TBS is designed to help children/youth and their parents/caregivers (when available) manage these behaviors utilizing short-term, measurable goals based on the child' and family's needs.

TBS can help children/youth, families, foster parents, group home staff and school staff learn new ways of reducing and/or managing challenging behavior as well as strategies and skills to increase the kinds of behavior that will allow children/youth to be successful in their current environment. A TBS treatment plan will be developed by the treatment team to outline what the child/youth, the family/caregiver and the TBS specialist will do during TBS, and when and where TBS will occur. The TBS plan will identify and describe the challenging behaviors that need to change and the replacement behaviors the TBS specialist will teach the child/youth and family/caregivers. The plan will say when the TBS specialist will work with the child/youth and family/caregivers. The hours may be during the day, early morning, evening or night. The days may be on weekends, as well as weekdays. The TBS specialist can work with children/youth in most places where they are likely to need help with challenging behaviors. This includes family homes, foster homes, group homes, schools, day treatment programs and many other areas in the community. The TBS specialist, the child/youth and the family/caregiver will work together very intensely for a limited period of time, until a child/youth has displayed improvement with behavioral goals and no longer needs TBS.

Service Philosophy

TBS is based on the research and philosophies of Behavior Modification. Evidence shows that the success of an intervention hinges on: 1) understanding why children behave in a certain way; and 2) replacing inappropriate behavior with a more suitable behavior that serves the same function (or results in the same outcome) as the challenging behavior. Intervention with challenging behavior begins with assessing and identifying the underlying needs being met by the maladaptive behavior.
TBS is provided to children/youth and their families/caregivers in the community through a well-trained interdisciplinary team of licensed and unlicensed staff. Services are provided working cooperatively and collaboratively with the child/youth, family/caregiver, community agencies and the TBS professional staff. The TBS mental health plan development and service delivery is based on the following tenants and values:

1. The belief that when provided with useful therapeutic tools, a child/youth can learn to manage their symptoms, yielding success in the home, school and community.

1

2. The belief in the importance of cultural competence and sensitivity and multi-lingual mental service delivery in meeting the diverse cultural needs of consumers.

3. The belief that the parents and guardians of the child are an integral and valued member of the child's treatment team.

4. The belief that children/youth that have experienced or are experiencing serious emotional distress during times of crisis, loss and transition will stabilize successfully when provided with competent and comprehensive short-term one-to-one support.

5. The belief in providing children/youth with specific, measurable and accomplishable short and long-term treatment goals specially focused on their areas of need.

6. The belief in the importance of self-determination and the formulation of individualized Treatment Plans involving the child/youth and family/caregiver in this process, highly valuing their input from the onset of service delivery.

7. The belief in the importance of children/youth being placed in the least restrictive environment with full inclusion in age and developmentally appropriate activities, peer groups and education.

8. The belief in the commitment to child/youth wellness, creating well-being, obtaining balance in one's life and helping the child/youth to realize and reach their potential.

## Family Engagement

The process of engaging the family/caregiver is a crucial component of providing TBS. It is the role of the TBS clinician and assigned staff to welcome and engage the family/caregiver. The family/caregiver engagement process builds trust and sets the stage for the work to come. It can ultimately make or break the partnership and affect the success of the child and family's outcomes. Engagement with the child/youth and family/caregiver is an ongoing process and continues to need nurturing past the initial "getting to know you" phase.

## Cultural Competence

TBS is committed to the recognition and appreciation of cultural diversity among service delivery staff, clients and community partners. Every effort will be made to provide the service to the child/youth in their primary or preferred language. It is also important that any forms, documents, and brochures be provided in multiple languages to reflect the cultural needs of the community. It is critical for TBS programs to employ from diverse cultural and language backgrounds similar to that of the counties that are served. As consumers are referred, their language and cultural needs should be matched with the appropriate Specialist(s).

It is equally important that TBS is committed to an atmosphere of inclusion, engagement, and supportive collaboration. Whenever possible, family/care givers should be encouraged to participate in the treatment plan implementation to promote understanding of the service and allow them to take ownership of the outcomes and an improvement in their child's/youth's functioning. Families who participate in TBS should feel non-judged, welcomed, and included in the process of helping their child/youth. TBS should make every effort to meet the family/caregivers "where they are" and make

2

any time, day, or environmental (location) adjustments that will help with the service be successful and limit the intrusiveness of the interventions.

Service Delivery

After receiving the TBS referral, the TBS clinician or TBS specialist will initiate contact to help coordinate a TBS Initial meeting with the referring clinician/social worker/probation officer, the family or guardian, the client and other significant parties in the child's/youth's life to discuss treatment planning and service delivery. The TBS service delivery model should be based on a comprehensive assessment focusing on the child's/youth's strengths and needs. A licensed clinician (LPHA) should oversee the Initial Treatment Planning meeting to develop the TBS Treatment Plan and provide ongoing therapeutic supervision of services.

Initial Meeting of the Treatment Team

1. The meeting is attended by a TBS clinician in conjunction with TBS staff, parent/caregiver, child/youth, and the referring party (ie. mental health worker, probation officer, social worker). This group comprises the treatment team. Other participants in the treatment team may include family members, teachers, therapists, partner agencies, support staff, etc.

2. At this meeting, TBS is introduced and explained before any discussion of the child's/youth's behavior occurs. Key points that are discussed:
   a. It is very important that the parent/caregiver take as active a role in plan development and plan implementation as possible. It is advised that a parent/caregiver be at home during home visits so the TBS staff can check in and out with an adult. The parent/caregiver is not required to sit down with the specialist at all visits, but may be asked to participate in a parent meeting, family meeting or child/youth meeting from time to time. By the end of services the parent/caregiver should be equipped in utilizing effective TBS interventions with their child/youth. It is important to note here that TBS can still be an effective intervention for youths who may not have parental/caregiver involvement in their lives at the time of the service delivery. This is especially true for Transitional Age Youth (age 18 to 21).
   b. Team communication is very important. TBS specialists will be discussing the case with the clinician, teacher, parents/caregivers, etc. to ensure that the entire treatment team knows what is working and areas that need more attention. It is recommended that a team should meet at least every 30 days to review the progress and adjust the plan as the goals are being met.
   c. Finally, TBS is not a crisis response service. In the event of a crisis the family/caregiver is encouraged to utilize a crisis stabilization service and/or follow a safety plan established in conjunction with their primary therapist/worker.

3. The TBS team then has a discussion of challenging behaviors, narrowing the behavioral concerns and developing a TBS Treatment Plan in conjunction with the overall goals of the Mental Health Treatment Plan.

The TBS Treatment Plan

During the initial meeting process, specific and measurable data related to the frequency and duration of the child's/youth's challenging behaviors is obtained to enable comparison as services progress. To promote collaboration for client benefit, a signed release of information is requested at the time of the initial assessment so that communication can occur with the child's/youth's therapist/worker and/or other members of the TBS team.

The individualized TBS Plan will identify specific target behaviors and/or symptoms that are jeopardizing the current placement or are presenting a significant barrier to transitions. A careful review of the presenting symptoms and subsequent behaviors to be targeted is prioritized, with the plan focusing on the behavior(s) that are most likely to disrupt the child's/youth's current living arrangement, inhibit the ability to transition to a lower level of care, or that will lead to placement in a higher level of care.

It is of utmost importance that goals in the individualized TBS Plan are clearly stated in specific and measurable terms. The goals reflect the child's/youth's baseline performance in targeted areas so that progress can be accurately recognized. Pre-test data is intended to offer accurate information related to the consumer's baseline performance and involves reports by both the child/youth and their family or caregiver. Each target behavior is stated in descriptive and measurable means. Interventions to target each behavior are determined and specific measurable outcomes are identified.

An important factor is to determine antecedents and consequences to the child's/youth's challenging behavior. Antecedents and consequences are not always apparent at the time of the Initial Meeting, and therefore determining antecedents and consequences to challenging behaviors is often incorporated into the child's/youth's TBS Treatment Plan as an early primary intervention.

TBS Initial Plan Implementation and Assessment Period

During the first 30 days of treatment, TBS is in an implementation and assessment phase. It is crucial to engage the family/caregivers and build trust during this phase. The TBS specialist should begin introducing the treatment plan and gather first hand data in regards to the child's/youth's challenging behaviors. This period at the beginning stage of TBS include giving immediate assistance to the child/youth and parent/caregiver to relieve stress and avoid crisis, while also gathering valuable information on the function and intensity of the behavior in the environment where it occurs. The TBS Specialist in conjunction with the TBS clinician should complete a Functional Analysis of Behavior, including: 1) identification of target behaviors, 2) frequency, intensity and duration of target behaviors, 3) antecedents and consequences of the behaviors (function), and 4) potential replacement or alternative behaviors, during this timeframe.

A child's/youth's progress toward goals and objectives offers valuable insight into the child's/youth's ability to manage their symptoms, make appropriate choices in the future without TBS assistance, and their ability to incorporate skills and coping strategies learned into daily living.

A key component to behavior monitoring and overall child/youth success involves obtaining accurate baseline data related to the symptoms/behaviors to be targeted in the Treatment Plan. During the initial assessment process, the child's/youth's Treatment Team, i.e. licensed therapist, TBS Specialist, TBS supervising clinician, the child's family or caregivers and the child/youth should carefully adhere to the following guidelines to ensure a meaningful and accurate baseline evaluation of the child's/youth's behaviors:

1. Careful documentation of the initial frequency and duration of the challenging behaviors to be targeted.

2. In obtaining this baseline behavioral data, the clinician and TBS Specialist will gather this data from a variety of sources which may include observations by the TBS Specialist, parent or caregiver, child's/youth's self-report, teacher and/or primary therapist.

3. A careful review of environments (school, home, community) where the target behaviors are demonstrated will be completed. Specific information related to each domain will offer an ability to effectively monitor progress in each setting.

4. During the assessment and beyond, identification of antecedents and consequences to target behaviors will be a focus of the behavior monitoring process, continuing to gather valuable information that assists in understanding the origins and precipitating events to challenging behaviors and symptoms.

5. The ongoing assessment of the child's/youth's behavioral changes will employ daily observations, reports and information obtained from family/care providers and the evaluation of the frequency of targeted behaviors.

Progress will be stated in measurable and specific terms throughout TBS involvement. Treatment plan modifications result from a review process between the Specialist, Clinician and Treatment Team.

TBS Interventions

TBS interventions are based upon the tenants of behavior modification, cognitive-behavioral therapy and supported by evidence-based practices. TBS interventions will be provided on-site with the child/youth through one-to-one child/youth and TBS Specialist therapeutic contact. TBS interventions are designed to help the child/youth develop improved emotional and behavioral skills and increase the child's/youth's ability to manage symptoms and behaviors once treatment goals have been met and services have been discontinued.

Interventions should be developed with the goal of parent/caregiver learning adaptive skills in order to successfully manage their child's/youth's behaviors once TBS has ended. It is critical that parents/caregivers be able to watch, practice, role play, and implement interventions with the child/youth while TBS staff is present in the environment (home, classroom, etc.) to increase confidence, consistency, and sustainability.

Interventions will be stated clearly and concisely reflecting the methods that will be employed to meet the desired goals or outcomes. Interventions are designed to build skills and provide the child/youth with tools to address their areas of difficulty; i.e. anger, threats, impulsivity.

Interventions are planned and implemented to increase the child's/youth's ability to cope with situations that lead to behaviors/ choices, which jeopardize success in their home, school or community.

The TBS Specialist should be trained in providing behavioral interventions to emotionally and/or behaviorally challenged children and youth. TBS Treatment Plan goals are accomplished through planned interventions, which commonly include: role modeling, intermittent and planned reinforcements, teaching the child/youth and parent/caregiver coping skills and strategies for symptom/behavior management and empowerment. TBS Specialists will focus on the child/youth and family's/caregiver's strengths, talents and interests in developing intervention strategies. Through planned and systematic interventions, the child or youth will learn to exhibit self-control, act responsibly and feel empowered and successful. The development of a trusting one-to-one relationship with their TBS Specialist will help in acquiring and developing interpersonal skills.

Meaningful incentives and consequences to the child/youth will be determined, and a plan for either intermittent or planned reinforcements will be included in the treatment plan to reinforce desired behavior. Parents/Caregivers should take an active role in developing incentives and consequences and the interventions should fall within the general scope and ability of the parent/caregiver to fulfill after TBS is terminated.

The following are guidelines for respectful and successful TBS interventions:

1. The purpose of TBS interventions is to teach, not control. Children/youth need to learn how to make informed choices, weighing the potential consequences and rewards for their choices (behaviors).

2. All children/youth have a need and desire to be successful, liked and appreciated by adults and their peers. However, the manner in which they attempt to get their needs met is often not appropriate. Through one-to-one support and education, they can learn to meet their needs in a more successful manner.

3. All behaviors are intentional and have a purpose to the child/youth. Through determining the outcome desired by the child/youth, successful interventions can be developed to achieve this outcome.

4. The child/youth and their family/caregivers are valued members of the Treatment Team and should be included in all aspects of service delivery.

5. There is always hope for a positive outcome, regardless of the child's/youth's history or symptoms. The ability of the Treatment Team to maintain hope and faith in the child/youth and their positive outcome is imperative to success.

6. Lastly, all children/youths and their families/caregivers deserve the best efforts of professionals to provide services in a competent, ethical and consistent manner.

<u>TBS Supervision</u>

TBS Supervision is recommended as a valuable means of monitoring the success of interventions to effectively meet the TBS Treatment Plan goals and objectives. It is important that all staff providing direct service attend regular Supervision. For example, one TBS Case Model consists of weekly meetings held for two hours in duration and includes a team (max. 8 members) consisting of the TBS supervising clinician and the TBS Specialist(s) providing services to children/youth. The focus of supervision is to discuss pertinent issues related to the child/youth and services, which may include:

- Group discussion and updates on ongoing issues regarding safety and safety plan for child/youth, other children/youth, family/caregivers and TBS specialists.
- Follow up discussion and processing of crisis events by the group.
- Discussion of child's/youth's progress toward TBS goals. Emerging issues are also discussed.
- Discussion of behavioral intervention strategies as well as to work as a team to provide encouragement, ideas and feedback regarding interventions to individual specialists.
- Discussion of challenges in the provision of TBS services (i.e. rapport lapses, child/youth participation, level of parent/caregiver involvement, environmental factors, etc.)
- Discussion of and provision of group support for TBS Specialists' frustrations and personal challenges in the field.
- To inform the group of any changes to TBS scheduling, procedure or protocol.
- To provide training to the group regarding clinical issues such as boundaries and confidentiality.
- Discussion of upcoming TBS reviews, contact with primary clinician, frequency of services and fade out plan.
- To acknowledge the successes of the child/youth and family/caregivers.

## Monthly TBS Review Meetings

Monthly TBS Review Meetings should be scheduled and all Treatment Team members be included. In addition to the TBS clinician, TBS Specialist, the child/youth, their parents/caregivers, members may include the child's/youth's primary therapist, child's/youth's care coordinator(s), the Case Manager and/or placement worker and any person who is significant to the child/youth and who has information that may be helpful to the TBS Treatment Plan. The focus of the TBS Review Meeting is to determine the effectiveness of the plan and the interventions and to adapt the plan as needed in order to facilitate progress toward the TBS goals. Treatment Team members should be encouraged to offer suggestions, observations and insight into TBS service delivery, progress and interventions employed. Parents/caregivers should be encouraged and supported in bringing up any concerns or issues with regards to TBS and how it is being implemented in their environment. The child/youth should be invited to this meeting to share their thoughts and experiences resulting from TBS involvement. Recommendations for changes in the level of services, interventions or modifications in the targeted behaviors should be discussed at this meeting.

## TBS Termination

In response to the time limited nature of TBS, transition and/or termination procedures are thoroughly discussed with the child/youth, family/caregivers and primary therapist/worker during the Initial meeting and throughout the service. Criteria for decreases and/or increases in the intensity of TBS services and eventual elimination of these services are based on the child's/youth's progress

toward behavioral goals delineated in his/her Treatment Plan. Based on the child's/youth's progress, the frequency and/or duration of services are adjusted, transitioned or titrated. These transitions are discussed with the child/youth, family/caregiver, and treatment team at regular (monthly) TBS Review Meetings. From the inception of services, the treatment team will be advised of the following to offer them a framework for transitioning TBS services:

1. TBS services are not meant to "fix" a child/youth or lead to a "perfect" child/youth or perhaps an absolute elimination of all target behaviors. Rather, the goal of TBS services is to provide meaningful interventions to the child/youth and family/caregivers that leads to a significant reduction in the targeted behaviors.

2. Through TBS service delivery, the child/youth and parent/caregiver will develop skills and strategies for coping with the child's/youth's target behaviors.

3. TBS is team-based and the parent/caregiver and child/youth are significant members of the team. In a family based or home environment, child/youth and parent/caregiver involvement in TBS service delivery and TBS Review Meetings are critical to the success of services. It is highly probable that TBS services will <u>not</u> be successful, in this environment, without child/youth and family/caregiver involvement.

4. TBS <u>can</u> be effective in working with Transition Age Youth (age18-21) or children/youth who do not have immediate adult support. But it is crucial that from the onset of TBS, informal supports (friends, coaches, clergy, co-workers, etc.) for the child/youth be encouraged to take part on the Treatment Team(at the request of the child/youth) to ensure that termination of services does not feel like abandonment.

5. Decreases in TBS services are very exciting and represent an important accomplishment on the part of the child/youth, family/caregivers and significant support people in the child's life.

As transitions occur in the intensity of TBS services to the child/youth, an addendum to their Treatment Plan will be made. Addendums will also be made if it is determined that additional behaviors are in need of TBS interventions. When the majority or all of the targeted behaviors have been decreased to a level where the child/youth and parent/caregiver can maintain the child/youth successfully in their current environment <u>or</u> the child's/youth's targeted behaviors have decreased to a level that can increase the possibility of a successful transition to a lower level of care, then TBS can be terminated.

Decreases and the successful elimination of services will be communicated to the child/youth and family/caregivers as a very positive experience, as they have been successful for this to occur. Incentives, rewarding the success of the child/youth in progress towards their targeted behaviors will occur as services are decreased. When the successful completion of TBS services occurs, a "celebration/graduation" should be held for the child/youth and family/caregiver to recognize their accomplishments.

Towards the end of TBS service delivery, the TBS Specialist, child/youth and family/caregivers should establish/discuss a Setback Prevention and Response Plan. Factors to be discussed with the child/youth and family/caregivers to prevent and respond to setbacks include the following:

1. Attention to patterns, circumstances and antecedents to the child/youth exhibiting the targeted behaviors in setback prevention.

2. Support systems available to the child/youth and family/caregiver.

3. Community resources and agencies that are available to provide support.

4. Interventions learned that were successful for the child/youth and family/caregiver to manage symptoms/target behaviors.

5. The importance of maintaining open communication between the child/youth and their primary mental health clinician.

6. "Speaking up" right way when setbacks begin to occur, not allowing the behaviors to become extreme and frequent prior to getting help.

When TBS services are intensive and last for several months without observable improvement toward treatment goals, the appropriateness of the service to provide stabilization of the child's/youth's living situation will be assessed. To prevent inappropriate changes in placement and address a lack of the child/youth progress, strategies may include the following:

1. The lack of progress/lack of the child's/youth's response to the Treatment Plan should be discussed throughout the TBS Review Meeting process, both internally (TBS specialist and supervising clinician) and with the Treatment Team.

2. When a child/youth is unresponsive to TBS services being delivered, continual weekly efforts should occur to locate interventions and strategies to elicit a positive behavioral response. Members of the Treatment Team should be consulted to obtain their feedback.

3. Barriers to TBS service effectiveness should be explored and methods to counteract barriers are determined and implemented.

4. When, after extended TBS, a child's/youth's maladaptive behavior increases or progress toward target behavioral goals have plateaued, the Treatment Team should discuss possibilities that the child/youth may need alternative mental health services and/or determine if further TBS may be counterproductive, placing the child/youth at risk of an increased level of care.

Transition and termination of TBS is discussed with the child/youth and the family/caregivers throughout the service delivery. Given the intensity of the one-to-one child/youth and Specialist relationship, this can represent a significant loss to the child/youth. Specialists should receive training regarding the TBS termination process and termination principles when discontinuing services to the child/youth. The focus of termination/goodbyes as a positive and necessary process in life should be related to the child/youth by the Specialists. Teaching challenged children/youth to terminate in a positive way is very important and prepares them for these experiences throughout their life. The termination training for Specialists should address principles that include the following:

1. Based on the intense, yet time limited nature of this service, ongoing discussion should occur between the child/youth and Specialist about termination. Specialists should be advised not

to promise contact with the child/youth and that it is important that the child/youth experiences termination (goodbyes) in a positive way, as it is a process that occurs throughout their life.

2. Specialists should begin terminating with the child/youth 30 days prior to the proposed elimination of services. The TBS program should provide training to educate Specialists how to role model and help the child/youth express their feelings about termination (goodbye) and not seeing their Specialist anymore.

3. Specialists should plan a celebration/graduation from TBS with the child/youth, making this transition a happy and meaningful one. The child/youth should determine how they will say goodbye, who will be there and the activities that they will do to celebrate their success.

4. Reaching behavioral goals should be addressed as a very positive accomplishment, and as decreases in services occur, the child/youth should be complemented on their accomplishment and success.

5. Specialists should receive training on positive methods of creating transitional objects to be given at termination that offer the child/youth a tangible possession that they can refer to and feel good about as a reminder of all their hard work.

6. Specialists will also terminate with the family/caregivers and give/receive feedback from the parent/caregiver related to how the termination of TBS services is impacting their child/youth.

Treatment Team communication during the last 30 days will be to discuss the termination, receive feedback as to how the child/youth is responding, plans on responding to the child's/youth's reactions, and development of the Setback Prevention Plan. The child/youth may want some or all of the Treatment Team to attend their graduation celebration. The team will be encouraged to support the child/youth, process the termination (goodbye) with their Specialist and to present this as an exciting accomplishment for the child/youth.

Following termination and graduation the TBS Specialist should complete a TBS Discharge Summary. The TBS Discharge Summary details the child's/youth's progress/ or lack of progress toward the target goals that were demonstrated at each TBS Review Meeting as well as the overall outcome of the child/youth maintaining their home or residential placement or successful transition to a lower level of care.

# APPENDIX E

## Point 6: TBS Training

**Training Principles**

- Contracted services will be deliverables-based.

- The training goals are to develop a TBS training model and curriculum that:
  - Encompasses a framework based on "best practices" and includes key elements of service integrity.
  - Improves fidelity to a "best practice" model and clarifies the key elements of service integrity
  - Addresses county audit concerns.


- Key elements of the training model and curriculum will include:
  - Full engagement with child/youth and family
  - Strength based approach, assessment, and service delivery
  - Utilize parent/family expertise in problem solving around specific needs and patterns of child/youth
  - Provide non-judgmental, unconditional support to child/youth and family
  - Provide a consistent source of hope and encouragement
  - Address cultural competency
  - Build mutual respect, confidence and trust with child/youth and family
  - Address needs of transition age youth moving to independence
  - Include functional behavioral analysis of child/youth

  Parents and youth will be active participants in development of the training model and curriculum and will be included as co-trainers.

- Leverage other training resources e.g., MHSA Workforce Education & Training, Stigma/Discrimination Awareness training; Youth/Family Member Task Force; CMHDA; Rose Jenkins; CMHACY, Provider Associations, Community Colleges [for paraprofessional training] /CSU/UC/Private Universities).

- It was noted that some counties have strong programs, with multiple providers; others are less evolved in their implementation.  A suggestion to pair counties to provide coaching and support.

- Training will be evaluated to determine efficacy and adjustments needed in curriculum and approach.

1

**Training Implementation would include several options that would focus on adult learning modalities and include:**

- Statewide training via the development of DVD's, Brochures, Websites, and Manuals.

- Webinars to host statewide training that reaches out to larger number of providers and local mental health professionals, Para-professionals, students, etc.

- Regional in-person trainings.

- Innovative approaches such as Coaching, "Grand Rounds", and/or case consultation training format.

- Family-Feedback forums with practitioners involved.

- Learning Community Model.

- Statewide Satellite feeds to other locations (use community colleges option).

- TBS Institute (conference), similar to Wraparound Institute.

**Implementation Plan**

- DMH to Complete Training Plan by January 1, 2009.

- DMH to implement training by July 1, 2009.

2

## APPENDIX F

### Point 8: TBS Outreach

#### Principles

- There should be a particular focus on reaching class members and their supports who are currently unknown to the county MHPs.

- Outreach efforts should be overly broad and inclusive to assure maximum coverage and coordination. The purpose is to promote the dissemination of information regarding the availability of TBS and how to access the service when appropriate.

#### Recommendations

- Continue the annual mailing from CDMH to all Medi-Cal beneficiaries.

- Adopt electronic information dissemination best practices including the implementation of Website TBS information posting and links to be distributed widely.

- Survey site users to determine use patterns and suggestions for improvement and expanded access.

- Approach interested organizations such as CWDA, CPOC, and Partner organizations, etc. and ask them to post a link to the TBS information site.

- We labeled this an "E" strategy and noted the consistency with the goals of simplicity, sustainability, and fast access.

- The recommended E strategy for the broadest approach to TBS education and outreach will require expertise that would be best provided by CDMH.  CDMH shall survey stakeholders to determine the best approach to implementation, develop the appropriate web base and links and monitor implementation to assure consumer/stakeholder satisfaction.

- Address cultural competence and language

- Account for the digital divide – include printable documents and telephone service.

- Complete the roll out plan by January 1, 2009.