1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **CENTRAL DISTRICT OF CALIFORNIA**

8

9

10

11   EMILY Q. et al.,                    )        CASE NO. CV 98-4181 AHM (AJWx)

12                                        )

13            Plaintiffs,                 )        **SEVENTH REPORT IN RESPONSE**

14                                        )        **TO COURT'S ORDER APPOINTING**

15       v.                               )        **SPECIAL MASTER, FEBRUARY 21, 2008**

16                                        )

17                                        )

18                                        )

19   DIANA BONTA,                         )

20                                        )

21            Defendant.                  )        Honorable A. Howard Matz

22                                        )        Courtroom 14

23                                        )

24

1
2
3
4
5
6
7
8
9
10
11
12
13          **November 2010 – Emily Q. Special Master's Report**
14

1

2

3                                    **Table of Contents**

4

5

6        **Purpose of this Report**                                                    **4**

7

8        **Special Master's Response to the State's Report**                           **5**

9               Point One                                                       6

10              Point Two                                                       7

11              Point Three                                                     7

12              Point Four                                                      9

13              Point Five                                                     10

14              Point Six                                                      11

15              Point Seven                                                    11

16              Point Eight                                                    12

17              Summary of Special Master's Observations on Points One Through Eight     13

18              Point Nine                                                     13

19

20       **Special Master's Recommendations Pertaining to Court Exit**                  **18**

21              Proposed dates for the next Court appearance                   19

22

23       **Exhibit A: Members of the Emily Q. Settlement Team**                         **20**

24

25       **Exhibit B: Budget Proposal**                                                 **21**

26

27

1    As Special Master for the Emily Q. matter, I am pleased to provide the Court with my

2    findings regarding progress on the Emily Q. matter, my recommendations to the Court regarding

3    Court exit from the matter and my proposals for next steps.

4

5    **Purpose of this Report**

6    The purpose of this report is to summarize my observations specific to each of the nine

7    points in the plan, and to provide my recommendations to the Court regarding ending Court

8    jurisdiction over the Emily Q. matter.  The Exit Plan approved by this Court and filed on April 9,

9    2009 states:

10    ***"Termination of Jurisdiction by December 2010"***

11    The Special Master shall recommend that the Court terminate jurisdiction when he finds that:

12    • CDMH has fully implemented Points One through Eight of the Nine-Point Plan; and

13    • Two-thirds of the large- and medium-sized MHPs (18 MHPs) have been certified by the

14    Special Master as having fulfilled the benchmark requirements, and have established the

15    necessary conditions in the MHP to ensure sustained commitment to utilization, quality,

16    performance, training and engagement."

17    Exit Plan for the Emily Q Case (Dkt No. 571-3), page 15.

18    The California Department of Mental Health (CDMH) has already summarized its activities

19    and accomplishments over the last year in its recent report to the Court, *2010 Annual Assessment*

20    *For Implementation of the Emily Q. Nine-Point Plan And County Mental Health Plan*

21    *Performance* (Dkt. 609), filed October 29, 2010 (referenced below as the *CDMH 2010 Annual*

22    *Assessment*).  Overall, I concur with the conclusions in the report and find that CDMH has

23    ensured implementation of Points One through Eight of the Nine-Point Plan, provided guidance

24    and support to counties, and maintained transparency statewide.  I find that CDMH has satisfied

25    the first requirement for termination of jurisdiction in the Exit Plan.

26    Nonetheless, based on Therapeutic Behavioral Services (TBS) service data received from the

27    county mental health plans (MHPs), I find that, while TBS utilization by the MHPs has increased

28    overall, CDMH has not demonstrated that utilization has increased to the level required in the

29    Exit To Success Order of the Court (dated April 9, 2009).  Consequently, as discussed below, I

30    have not certified the minimum of 18 MHPs required by the Exit Plan.

1    I also would like to acknowledge the *Emily Q.* Settlement Team for its professionalism

2    and enduring commitment to getting the job done.  The following is a list of 12 representatives

3    who make up the Settlement Team (See Exhibit A for a complete list of participant names and

4    titles):

5    •   *California Department of Mental Health*: Assistant Deputy Director, Community

6        Services Division; Chief, Program and Policy Development Branch; and Chief and

7        Senior Counsels;

8    •   *Department of Health Care Services*: Chief, Medi-Cal Benefits Waivers Analysis

9        and Rates; and Senior Counsel;

10   •   *Representing the Class*: Disability Rights Of California, Senior Counsel; and Mental

11       Health Advocacy Services, Executive Director;

12   •   *Department of Justice, Office of the Attorney General*: Deputy Attorney General;

13   •   *California Mental Health Directors' Association (CMHDA)*:  Mental Health Director

14       for Sonoma County;

15   •   *Representing the Class perspective*: A Family Partner from a TBS and Wrap Around

16       agency who also is the parent of a child that has been in the public mental health

17       system; and a private sector mental health practitioner who delivers TBS to children

18       and families through county contracts.

19

20   **Special Master's Response to the State's Report**

21       In my role as Special Master to the *Emily Q.* effort, I would like to respond to the state's

22   presentation and recommendations included in the *CDMH 2010 Annual Assessment.*  In

23   summary, I make the following observations and findings of fact: That the California

24   Department of Mental Health and its MHPs have successfully implemented Points One through

25   Eight of the Nine Point Plan.  In this regard, I especially commend the efforts of Sean Tracy,

26   Assistant Deputy Director of the Community Services Division, CDMH Director Dr. Stephen

27   Mayberg, and their staff for their leadership, thoroughness, enthusiasm, engagement, and

28   transparency in implementing the Nine-Point Plan.  The CDMH team effort, in partnership with

29   the many others involved in the rollout process, has yielded remarkable success in advancing

30   TBS for children in the Emily Q. class and their families.

1         At the same time, however, and within the context of this remarkable effort, I also find

2 that – due principally to the short period of time since the Nine-Point Plan rollout began in

3 January 2009 – the exit criteria established in the "Exit To Success" Criteria for Performance and

4 Termination of Jurisdiction (dated April 7, 2009) have not yet been satisfied.  Although there is

5 evidence to suggest that the state and counties may be well on their way toward meeting the

6 Court exit criteria, I am unable at this time to certify that the benchmark criteria have been met in

7 the minimum set of 18 medium and large MHPs as required by the exit agreement.

8         The following discussion summarizes my observations regarding all nine points of the

9 plan.

10

11 Point One – Reduce Administrative Requirements

12    •   CDMH has continued to reduce and streamline the TBS administrative requirements in

13       order to promote increased TBS utilization since issuance of the Court Order of

14       November 2008.

15    •   As Special Master, I have received direct communication from MHPs and providers

16       corroborating CDMH's sustained positive efforts to reduce the TBS administrative

17       requirements.

18    •   Some MHPs have retained their own pre-Nine-Point Plan administrative requirements

19       for their own purposes, in particular pre-authorization requirements.  The effect of these

20       continued MHP requirements appears mixed, with some evidence that these MHP

21       practices may be hindering access to TBS in these MHPs.

22    •   CDMH and its contractor, the California Institute for Mental Health (CiMH), with

23       strong assistance from the SuperTACT advisory group and the department's Program

24       Compliance division, has developed a *TBS Documentation Manual* that is receiving

25       high marks among the MHPs, both for the clarity and quality of the information and for

26       its adoption by the division within CDMH that reviews and audits the MHPs.  A

27       national contractor in the area of Medicaid compliance recently referred to this manual

28       as "setting the gold standard" for documentation manuals nationally.  This manual has

29       greatly influenced increased utilization of TBS in the MHPs along with class member

30       access to TBS.

1

2    Point Two – Clarify Eligibility Requirements

3       •   Prior to the Nine-Point Plan, local service limitations and capacity problems such as

4            unavailability of residential or hospital placements and confusion regarding TBS

5            eligibility, had caused unintended barriers to TBS in many MHPs.  Following

6            clarification by CDMH of the TBS eligibility requirements, local decision-making and

7            service selection based on the clinical needs of the child (rather than on resource

8            availability or service limitations in the MHP) has greatly improved in many MHPs,

9            thereby opening and increasing class member access to TBS services.

10      •   During the past six months, I have not heard reports of MHPs expressing confusion or

11           uncertainty about the TBS eligibility requirements; instead, staff in the MHPs appear to

12           well understand these requirements and to be making TBS decisions based on correct

13           eligibility information.  I believe that the Documentation Manual (see comments under

14           Point Seven, below) has contributed significantly to clarifying the TBS eligibility

15           requirements and to resolving much of the uncertainty that existed prior to the Nine-

16           Point Plan.

17

18    Point Three– Establish an Accountability Process and Structure

19      •   CDMH has successfully implemented the TBS accountability effort in the majority of

20           MHPs and continues to promote efforts to permanently establish accountability in TBS

21           planning and decision-making at the state and county levels.  54 of the 56 MHPs have

22           substantially complied with Point Three.  Two Level Two MHPs – San Joaquin and

23           Merced – will require additional support and attention from CDMH.

24      •   Perhaps the most remarkable aspect of the accountability effort has been the

25           unprecedented level of transparency created by the CDMH Emily Q. Web page through

26           its MHP Progress Report and Data Dashboard.  This effort has raised the standard of

27           accountability for the department through its strong commitment to openness and to

28           sustained transparency into the future.  I commend CDMH and its contractor APS

29           Healthcare for their joint development of these clear, useful, accurate, responsive, and

30           user-friendly reports.

1     •   A central element of the accountability process has been the Data Dashboard developed

2         by CDMH and APS in collaboration with an array of partners and participants in the

3         Emily Q. effort.  The dashboards have allowed anyone with an interest in TBS and the

4         Emily Q. matter to review the most current quantitative data available about TBS in all

5         56 California MHPs.  I have heard on numerous occasions that people are looking at the

6         dashboard, understanding the information provided, and incorporating it into their

7         efforts to promote TBS utilization.

8     •   Similarly, nearly all of the MHPs have convened TBS accountability meetings in their

9         county and completed the tasks identified in Point Nine of the plan.  Again, I have heard

10         numerous reports that these meetings have helped people in the counties in their efforts

11         to increase TBS utilization.

12     •   Family and youth participants in the statewide TBS effort are reporting strong interest

13         in and satisfaction with the accountability effort and with the accessible and useful

14         Web-based information available to them.  As noted in various sections of the *CDMH*

15         *2010 Annual Assessment*, family and youth participation and collaboration at the state

16         and MHP levels has reached a remarkably high level, far above any previous efforts that

17         I have seen to engage and mobilize families and youth in any mental health initiative.

18     •   During the past year, the California Mental Health Directors Association (CMHDA) has

19         re-engaged with the TBS Nine-Point Plan effort by appointing a new county

20         representative to the Settlement Team, by partnering through its Small County

21         Committee, and by renewed participation in the SuperTACT monthly meetings.  I

22         commend both CDMH and CMHDA for their efforts to rebuild a positive relationship

23         in TBS in spite of other on-going contractual issues between the state and the counties.

24     •   There are, however, ongoing limitations to the accountability effort as a result of the

25         department changing its Short-Doyle mental health services reporting system; some

26         MHP data for 2010 are not yet available for validation or confirmation by the

27         department and APS.  This is more a reflection of larger statewide information issues

28         than of the TBS effort, although it does directly impact the sharing and analysis of TBS

29         utilization data in particular, and is currently limiting the department's ability to

30         demonstrate whether or not the Level II MHPs have satisfied the exit benchmark

1    requirement in Point Nine.  As noted later in this report, I believe these information

2    limitations are temporary and the full picture of TBS utilization across the state will

3    become clearer early in 2011.

4   •   With regard to the additional data elements described in Appendix C of the Nine-Point

5    Plan, the intention to compile, analyze, and interpret pre-post comparisons for

6    hospitalization, RCL 12+ placements, and other mental health services received, has

7    proved itself to be problematic as a resource in helping understand the impacts of TBS.

8    For example, through tremendous effort CDMH and APS were able to construct an

9    analysis of hospitalization data prior to and following TBS services that suggested

10   significant differences following TBS; however, there were so many unknowable

11   factors and alternative explanations for the differences – which produced a significant

12   amount of uncertainty and raised many unanswerable questions among CDMH staff and

13   Settlement Team members who tried to interpret these findings – that the Settlement

14   Team decided not to include this analysis in the Web-based dashboard.  There was great

15   concern that these analyses with ambiguous findings would confuse rather than

16   contribute to the broader discussion about TBS, so the effort was dropped in order to

17   use APS's limited contract resources in a more productive way.  With regard to pre-post

18   RCL 12+ placement data, CDMH and the California Department of Social Services

19   (CDSS) were able, for the first time, to combine and match data for Emily Q. class

20   members across both departments' information systems for the years 2006-2008;

21   however, the combined data did not reach far enough back in time to support

22   longitudinal analysis of pre-TBS placement, so this analysis could not be completed.

23   Consequently, this portion of the accountability plan was not completed.

24

25   Point Four – Establish a TBS Best Practices Approach

26   •   Key to CDMH's successful effort with regard to best practices has been the

27   development of its *TBS Coordination of Care and Best Practices Manual*.  The

28   inclusive and responsive process CDMH used to develop and improve this manual

29   speaks to the strong commitment to engagement and openness with the MHPs, TBS

30   providers, and family and youth partners.  This manual, in combination with CDMH

1     and MHP training efforts, offers great promise in improving and maintaining the TBS

2     effort statewide and has set a new higher standard for state leadership in promoting best

3     practices statewide.

4

5     <u>Point Five – Multi-Agency Coordination Strategy</u>

6     •   CDMH is to be commended for its effort in engaging and mobilizing family and youth

7        as partners in the statewide TBS Nine-Point Plan effort.  This remarkable effort is

8        gaining strength in many local communities and promises to significantly and positively

9        impact CDMH-community relations in perhaps unprecedented ways.  Similarly,

10      CDMH's efforts to promote the TBS Small County Strategy, in partnership with

11      CMHDA, promise a sustained statewide effort.

12     •   Nonetheless, there is a difference between these efforts and the intended purpose of

13        Point Five: to promote coordination among the various public and private agencies that

14        serve children in the Emily Q. class.  In early 2009, CDMH convened a group

15        representing statewide and county children's mental health, child welfare, special

16        education, and juvenile justice to explore and propose strategies for increasing

17        interagency collaboration statewide, and to help craft a solution to increase TBS

18        utilization by non-mental health agencies.  Quite appropriately, the *TBS Coordination of*

19        *Care and Best Practices Manual* emerged as one by-product of this 2009 strategy

20        session; however, the effort to bring together all these child-serving agencies to increase

21        TBS access outside the traditional mental health pathway will require developing,

22        maturing, and sustaining structural linkages and partnerships beyond the staff

23        practice/service-delivery level addressed through the manual.  As Special Master, I

24        strongly urge CDMH to reconvene the interagency group to celebrate the successful

25        care coordination manual and to promote its use across the range of intended agencies,

26        and then to work towards forming long-standing coordination and partnerships among

27        these state-level agencies.  CDMH started well and developed a very good product –

28        perhaps by reconvening and continuing the interagency coordination process additional

29        positive products and relationships can be developed and sustained for the benefit of

30        children in the Emily Q. class and their families.  I also suggest that CMHDA be

1    strongly encouraged to join this coordination effort.

2

3    Point Six – Statewide TBS Training Program

4    •    CDMH and its training contractor the California Institute for Mental Health (CiMH)

5         have developed and started delivering an excellent and well-received TBS training

6         program.  They strongly engaged the 27 Level II MHPs in soliciting needs and

7         opportunities for TBS training, and followed through with a very useful training

8         product.  So far, several counties have requested and received TBS training.  In

9         addition, Los Angeles County used the state training materials to create and pay for

10        their own TBS training during the summer of 2010 when CDMH's training resources

11        were not available due to the absence of a state 2010/11 budget.  Now that the budget

12        and training program are back on track, several other MHPs are preparing for TBS

13        training.

14    •    Furthermore, I have observed a new level of request for training in TBS advanced best

15        practices, which signals MHP interest in not just basic information about TBS and the

16        Nine-Point Plan approach, but a genuine desire to raise the scope and quality of TBS

17        best practice among providers.  This also suggests that some MHP staff and providers

18        are approaching a tipping point in establishing and sustaining quality TBS.

19    •    To date, nine of the 27 Level II MHPs have implemented TBS training, and several

20        more are planning future training.  Several of the Level II counties that have not

21        implemented training had already reached the 4 percent utilization benchmark and did

22        not feel the need for training; other MHPs reported that, due to limitations of staff time

23        and resources, they are unable to implement TBS training at this time.  It should be

24        noted that all of the Level II MHPs report that they are using the two TBS manuals and

25        that these are having a positive training effect on TBS delivery.  I suggest continued

26        effort by CDMH (which could greatly benefit from restored support by CMHDA) to

27        continue to promote TBS training statewide.

28

29    Point Seven – Technical Assistance Manuals

30    •    As noted earlier in this report, CDMH has developed and promoted two excellent

1    manuals – The *TBS Documentation Manual* and the *TBS Coordination of Care and Best*
2    *Practices Manual*.  I concur with the department's assessment of the importance and
3    quality of these manuals and consider them to be a key element of the statewide TBS
4    strategy.  These superlative manuals set a new high standard within CDMH for the type
5    of leadership the state is capable of providing, especially in the way these "state-owned"
6    manuals strengthen the capacity of the MHPs and private providers to fulfill the service
7    delivery expectations embedded in the Nine-Point Plan.

8    •   I also commend CDMH for the process it has used to craft these manuals – engaging
9    with an array of MHPs, TBS providers, state staff (including CDMH program
10   compliance staff), families and youth, and non-mental health agencies that serve Emily
11   Q. class members; soliciting and responding positively to detailed input from outside
12   the department; doing the difficult work of revising and reworking many sections of the
13   manuals several times to get them exactly right; and periodically reopening the review
14   and revision process to continuously improve the quality and integrity of the manuals.
15   CDMH staff and leadership involved in developing these manuals deserve tremendous
16   acclaim for their hard work and success.

17

18   Point Eight – Outreach Strategy

19   •   The key medium of TBS outreach has been the Emily Q./TBS Web page on the CDMH
20   Web site.  This effort represents the highest quality and state of the art effort in making
21   clear, consistent, useful, and relevant information available to all who are interested in
22   TBS.  As noted in the *CDMH 2010 Annual Assessment*, the site has been visited several
23   hundred thousand times and has received very positive reviews.  Family and youth
24   partners in the Nine-Point Plan process have been particularly positive in their reviews
25   of the array of qualitative and quantitative information available to them via the Web
26   page.

27   •   As noted earlier under Point Six, I strongly urge CDMH to reconvene the state-level
28   partnership group as another avenue for direct outreach to the array of non-mental
29   health agencies and providers that also serve children in the Emily Q. class and their
30   families.

1

2    Summary of Special Master's Observations on Points One Through Eight

3    •    As Special Master, I concur with CDMH's overall assessment of their progress in

4         successfully implementing Points One through Eight of the Nine-Point Plan.  The state

5         has done a very commendable job.

6    •    CDMH issued Information Notice 10-20 on September 23, which requires MHPs to

7         complete a self-certification checklist to help CDMH assess the status of MHP

8         compliance.  As of November 12, 2010, 50 of the 56 MHPs have completed this

9         Certification Checklist Form; only one Level II MHP (Riverside County) and five Level

10        I MHPs have not submitted the checklist. Based on the self-reported information in

11        these checklists, Based on MHP reports received by CDMH as of November 12, 2010:

12        17 of the Level II MHPs have satisfied the meeting and reporting requirements in the

13        Nine-Point plan; 8 of the Level II MHPs have nearly or partially satisfied these meeting

14        and reporting requirements; two Level II MHPs (Merced and San Joaquin counties)

15        have not demonstrated evidence of satisfying the requirements of the Nine-Point Plan.

16   •    As reflected in the *2010 Annual Assessment*, the state has demonstrated strong

17        commitment to fulfilling the requirements of Points One through Eight of the Nine-

18        Point Plan in order to satisfy the Court exit requirements detailed in Point Nine.  I

19        strongly agree with and commend the effort put forward by CDMH to promote TBS

20        through this multifaceted strategy.

21   Point Nine – Court Exit Process

22   •    The Exit Plan requires that the Special Master certify that 18 of the large and medium

23        sized MHPs.demonstrate that their TBS utilization meets benchmark requirements.

24        MHPs can meet the benchmark if their claims data shows that they are providing TBS

25        to 4% of their Medi-Cal EPSDT clients, or that they are providing services equivalent to

26        TBS that, combined with TBS, meet the 4% benchmark, or that the Special Master

27        certified that the MHP is on a trajectory to reach the 4% benchmark by June 2012.   In

28        addition, certification requires a finding from the Special Master that the MHPs also

29        meet five additional criteria relating to quality, data reporting, engagement, outreach,

30        and training.  Attachment A to *CDMH Annual Assessment Plan* (Dkt 609), page 26

1       (CDMH Information Notice).

2   •   Over the past four months, my consultant Steven Korosec and I have worked intensely

3       with and made site visits to seven large and medium MHPs in order to identify TBS

4       equivalent services in those MHPs, and to determine if those services meet the

5       equivalency requirements developed by the Settlement Team.  Additionally, we have

6       been in conversations with other counties in preparation for a site visit for determination

7       of TBS equivalent services.  We have been extremely impressed with the quality of

8       care, thoughtful planning of services, and the increasing focus on use of therapeutic

9       behavioral interventions to Emily Q. class members and other at risk children and

10      youth.  In each of our site visits, which require at least one day and often two days, we

11      have found significant evidence of TBS and TBS equivalent services.

12  •   I have also been impressed by the various MHPs' and private providers' understanding

13      that striving to meet or exceed the 4 percent TBS benchmark is not about reaching an

14      artificial penetration rate, but rather is about growing and sustaining this critical service.

15      The strategic purpose of the benchmark is to promote and encourage formation of a

16      system to increase capacity in the areas of staff recruitment and training, and to refine

17      skill sets of staff in the delivery of TBS and equivalent services; it also is about

18      increasing community understanding of what TBS is and increasing the professional

19      community's understanding of the value and impact of TBS on keeping children safe,

20      healthy, in school, out of trouble, and at home.  The Settlement Team selected the 4

21      percent benchmark as a strategy to motivate all the MHPs to raise their TBS capacity to

22      a higher level – for most counties, 4 percent was double or more than their current

23      utilization and would require deliberate effort and focused commitment to reach it, but

24      it was not so high a mark as to be unreachable or discouraging.  Looking back over the

25      past two years, the benchmark is serving its purpose – overall TBS utilization has

26      increased and the majority of MHPs have put forward a meaningful effort to increase

27      and improve TBS.  As a result of the 4 percent benchmark and the other eight points of

28      the plan, California is on the verge of sustained capacity to provide high quality TBS

29      services to children in the Emily Q. class and others who can benefit from behavioral

30      interventions.

1  •  Nonetheless, CDMH has not yet demonstrated that it has satisfied the central
2     requirement of the Nine-Point Plan – that TBS utilization reach the 4 percent
3     benchmark among at least 18 of the 27 Level II MHPs.  Specifically, CDMH has not yet
4     collected and validated TBS utilization data that demonstrates achievement of this 4
5     percent benchmark.  CMDH has faced two primary barriers to reaching the benchmark.
6  •  First, the relatively short period of time between implementation of the Nine-Point Plan
7     in January, 2009 and the current date in November, 2010 is perhaps the best explanation
8     why the benchmark has not yet been reached – the massive engagement, mobilization,
9     development, and service reconfiguration process required to increase TBS across the
10    majority of MHPs represents an enormous challenge at both the state and MHP levels.
11    Ramping up to the new TBS requirements involves identifying staff and resources,
12    changing contract terms with private providers, reconfiguring service delivery, and
13    problem solving to increase and sustain momentum – all of this takes time, especially in
14    the context of massive budget cuts in state and county services.  Significant effort and
15    movement has been made at all levels, which if sustained will likely produce the
16    intended TBS utilization rate; however, the benchmark has not yet been reached in a
17    sufficient number of Level II counties for me to certify that the Court exit requirement
18    has been met.
19  •  Second, the TBS benchmark process relies heavily on the statewide Short-Doyle II
20    mental health data reporting system, which has undergone a complete transformation
21    concurrent with the period of implementing the Nine-Point Plan.  CDMH and the MHPs
22    have nearly completed the transition to the new Short-Doyle II system, but there remain
23    many data reliability and reporting issues that make it impossible to definitively
24    determine how many members of the Emily Q. class have received TBS during 2010.
25    For example, CDMH only received its first cut of the new Short-Doyle II fiscal year
26    2009/10 data in October of 2010 and has not had time yet to review the data, validate it,
27    analyze and interpret what it might mean, and incorporate it into its planning and
28    programming process – and because the state priority has been to develop budget
29    information for the legislature to inform the state budget crisis, CDMH fiscal analysis
30    staff have had no opportunity to fully review the TBS data.  As such, validated state-

1    level data are not yet available to determine whether or not CDMH has met the

2    benchmark.

3    •   As part of its commitment not to overburden the MHPs with TBS data reporting

4        requirements, CDMH agreed to provide the utilization data I would need as Special

5        Master to certify MHP and state satisfaction of the benchmark.  At this time, because of

6        the Short-Doyle II transition process, CDMH does not have validated data to fully

7        report on MHP progress toward the benchmark.  To its great credit, CDMH offered the

8        Level II MHPs the opportunity to provide their own TBS service delivery data as a way

9        to document their TBS service delivery; however the majority of Level II MHPs have

10       been unable to demonstrate achievement of the benchmark with either state or local

11       data.  Within the context of these data limitations, preliminary un-validated TBS data

12       suggest that three MHPs, in addition to the five that had already reached 4 percent prior

13       to the Nine-Point Plan, appear to be at or above 4 percent, and a number of other MHPs

14       appear to be increasing TBS utilization to reach the benchmark in the near future.

15       However, even under the most optimistic interpretation of the current data, at this time I

16       cannot certify that 18 of the 27 Level II MHPs have reached or are on a trajectory to

17       reach the benchmark.

18   •   For its part, I believe that CDMH has done everything within its power to promote

19       increased TBS utilization and to develop the necessary data systems to report on the

20       benchmark.  I have worked alongside CDMH to identify and work with MHPs that

21       offer TBS-equivalent services, to document their efforts, and to add their TBS

22       equivalent services to the count of their direct-billed TBS.  In spite of this tremendous

23       effort by CDMH, we are unable to verify that the minimum number of MHPs have met

24       the benchmark requirement, which was agreed upon as the "tipping point" number that

25       would indicate that TBS had been successfully implemented in a sufficient number of

26       MHPs to ensure that TBS is firmly established and will be sustained statewide.

27   •   Within the context of these TBS utilization data limitations, as of November 5, 2010,

28       using the best data available from the Short-Doyle II data system, I would consider

29       providing ***provisional 4 percent benchmark certification*** for the following eight MHPs:

30       Contra Costa, Marin, Orange, San Francisco, Santa Barbara, Santa Clara, San Luis

1    Obispo, and Ventura.  I would expect that data validation demonstrating success will be

2    completed for these counties by January 31, 2011, at which time I would officially

3    certify and notify the Director of the State Department of Mental Health that these eight

4    MHPs have succeeded in meeting the requirements of the Nine Point Plan.

5    •    Eight additional MHPs have indicated to the Special Master that they will have met or

6    exceeded the 4 percent benchmark through a ***combination of TBS utilization data and***

7    ***TBS equivalent services by June 30, 2011***.  These MHPs include San Mateo, Sonoma,

8    Sacramento, San Diego, San Bernardino, Santa Cruz, Monterey, and Butte.  I expect

9    that several additional MHPs not listed here will also request certification by the Special

10   Master during this same period.

11   •    And, six MHPs have notified me that they will be requesting certification during the

12   latter part of fiscal year 2010/11, based on a combination of TBS utilization data,

13   determination of TBS equivalency, and/or being on a ***trajectory to reach the 4 percent***

14   ***TBS utilization benchmark no later than June 30, 2012***.  At this time the exact

15   number is not confirmed but the following MHPs have indicated interest in being

16   considered: Los Angeles, Riverside, Placer/Sierra, Tulare, Merced, and Kern.

17   •    The best data available to us and summarized above – based on the period from July

18   2009 through June 2010, including more recent data provided by some of the MHPs –

19   indicates that, although the majority of Level II MHPs are optimistic and working hard

20   to satisfy the benchmark, the proposed tipping point for TBS sustainability has not yet

21   been reached and may not be reached for some time.  For this reason I am

22   recommending that Court jurisdiction be continued until such time as this benchmark is

23   reached in the minimum set of 18 Level II MHPs.  I will discuss my recommendations

24   in the following section of this report.

25   •    It is important to note that, while the parties share in the success of implementing Points

26   One through Eight, they have not yet been able to resolve the question regarding the

27   timing of Court exit from the Emily Q. case.  I believe that both parties will respond to

28   the findings and recommendations I have presented in this report, either in writing or in

29   person before the Court, so I am not going to comment further here regarding their

30   respective positions on the timing of exit.

**Special Master's Recommendations Pertaining to Court Exit**

In light of the observations I have summarized above, I make the following recommendations:

1. The Court shall extend jurisdiction in the Emily Q. matter for one year, until December 31, 2011.

2. If the state is able to demonstrate that it has met the 4 percent benchmark requirement as adopted in the Court's Order dated April 23, 2009, Exit Plan for the Emily Q. v Bonta case, prior to December 31, 2011, it may request that jurisdiction terminate on an earlier date.

3. The Court shall retain Richard Saletta as Special Master, with a modified scope of duties and modified budget.  The Special Master will continue to file quarterly reports regarding data, progress, etc.

4. For 2011, the Special Master (and not CDMH) will continue to certify county MHPs meeting or exceeding the 4 percent benchmark and provide notice of determination of TBS equivalent services, and determine trajectory to achieve compliance by June 2012.

5. The state shall have the discretion to convene meetings regarding progress and compliance, as it deems necessary.

6. The state will continue to provide data to the Special Master and the plaintiffs regarding TBS utilization data, and other related dashboard measures.

7. The Special Master will retain authority to determine whether the state has met the exit criteria set out in court orders, including making determinations regarding equivalent services and whether counties are on a trajectory to achieve compliance by June 2012.

8. In 2011, the state will continue to undertake all the duties to which it has already committed in previous post exit court orders, other than those noted above.

9. The parties will meet in September, 2011 to review TBS utilization data, related dashboard measures and progress and discuss the Special Master's proposed findings and recommendations.

10. The Special Master shall file proposed findings of fact and make recommendations and proposed orders prior to termination of jurisdiction.  This report will be filed no later than

1    October 1, 2011.

2    11. The Court shall approve the Special Master's proposed budget, Exhibit B.

3

4    Proposed dates for the next Court appearance

5    The Order of Appointment provided that a hearing shall be held three weeks after the

6    filing of a Special Master's report, which will be December 13, 2010.  Alternatively, the Special

7    Master and all parties are also available for a hearing on December 14, 16, and 17, 2010.

8

9    In closing, I would like to again thank the Court for affording me the privilege of serving

10   as Special Master for this matter.  .

11

12

13   Dated:  November 15, 2010                    Respectfully Submitted

14

15                                                          /s/

16

17                                                          Richard Saletta, LCSW

18

1

2                             **Exhibit A:  Members of the Emily Q. Settlement Team**

3 *California State Department of Mental Health*

4     •   Sean Tracy, Assistant Deputy Director, Community Services Division.

5     •   Rita McCabe, Chief, Program and Policy Development Branch, Community Services

6        Division.

7     •   Cynthia Rodriguez, Chief Deputy, Legal Services.

8     •   Barbara Zweig, Senior Staff Attorney, Legal Services.

9 *California State Department of Health Care Services*

10     •   Dina Gonzales, Chief, Medi-Cal Benefits Waiver Analysis and Rates.

11     •   John Krause, Senior Counsel, Legal Services.

12 *Representing the Class*

13     •   Melinda Bird, Senior Counsel, Disability Rights of California.

14     •   Jim Preis, Executive Director, Mental Health Advocacy Services, Inc.

15     •   Cynthia Robbins-Roth, Parent Partner, Edgewood Center for Children, Wraparound/TBS

16        Turning Point, San Mateo.

17     •   Tom Sodergren, TBS Practitioner, Director of Community Services, Casa Pacifica.

18 *California State Department of Justice, Office of the Attorney General*

19     •   Melinda Vaughan, Deputy Attorney General.

20 *Representing Counties*

21     •   Michael Kennedy, Director of Mental Health, Sonoma County, California Mental Health

22        Directors Association.

23

1                      **Exhibit B – Budget Proposal**

2    <u>Budget: January 1–June 30, 2011</u> - $38,320.00

3                 The Special Master proposes the following budget, including travel and incidental

4                 expenses, for the last six months of FY 2010/2011. The state has requested that I

5                 budget within the fiscal year.  If exit has not been attained by June 30, 2011, the

6                 Special Master anticipates submitting a final budget for July 1, 2011 to December

7                 31, 2011.

8

9    <u>Special Master and Consultants: January – June 30, 2011</u> – $32,600

10   The Special Master will conduct the following activities:

11   - Convene and oversee the Emily Q. Settlement Team (I anticipate two

12     meetings).

13   - Site visits with county departments of mental health/MHPs for the purpose(s)

14     of determination of TBS equivalency, and/or TBS trajectory and as

15     appropriate, certification of a county/MHP attaining its 4 percent TBS

16     benchmark.  I estimate a minimum of ten site visits to counties – four southern

17     and six central/northern California.

18   - Participate in meetings with CDMH, the Emily Q. plaintiffs, and other

19     stakeholders.

20   - Provide technical assistance and consultation to CDMH.

21   - Develop and submit reports to the Court as required.

22   - Appear in Court as required to report progress and account for the Emily Q.

23     effort.

24

25   <u>Assistance and support from consultants to the Special Master</u>

26   - Co-facilitate the Settlement Team meeting and prepare written summaries (I

27     anticipate two meetings).

28   - Provide technical assistance to CDMH.

29   - Assist with TBS equivalent services county MHP site visits.

30   - Data analysis and interpretation.

1                •   Assist with Court reports.

2

3            The Special Master will be reimbursed at $150.00 per hour and consultants

4            reimbursed at $100.00 per hour.

5   <u>Travel and Incidental Costs: January-June 30, 2011</u> – $5,000.00:

6                •   I anticipate that Settlement Team meetings will continue to take place in

7                     Sacramento, within one hour of my office.  I will not be submitting an invoice

8                     for this travel expense (I anticipate two meetings).

9

10               •   I will be submitting an invoice for travel and incidental expenses associated

11                    with county MHP visits for the purposes of determination of TBS

12                    equivalency, and/or TBS trajectory, and as appropriate, certification of a

13                    county/MHP attaining it's 4 percent TBS benchmark, and any required Court

14                    appearance.  At this time, I estimate air travel to Southern California four

15                    times for the Special Master and one consultant to meet with county MHPs,

16                    and for one Court appearance.  Expenses will include airfare**,** parking, and –

17                    when necessary for MHP/County site visits requiring more than one day –

18                    lodging expenses.

19

20   <u>Parent and Practitioner Settlement Team participation</u> – $720.00

21               •   I will continue to reimburse the parent and practitioner members' travel

22                    expenses related to attending Settlement Team meetings or ad hoc task group

23                    meetings  (I anticipate two meetings).  As noted in earlier reports, their

24                    employers have donated these members' time – only their travel and

25                    incidental expenses are included in this request for additional funding.

26               •   I will be submitting an expense invoice for parent and practitioner

27                    participation with the Settlement Team.