1  helpful also to look at the statewide effort of all 56 MHPs to increase TBS utilization. The

2  following two charts display six years of TBS utilization for all the MHPs combined in order to

3  show the statewide increase in TBS, especially <u>since implementation of the Nine Point Plan in</u>

4  <u>January 2009</u>. The first chart displays statewide TBS and TBS-equivalent data as a percentage

5  for calendar years (CY) 2005 through 2010.

6

7

8

9

10

11

12

13

14

15

16

17

18

19



20  As noted on the chart above, the statewide TBS utilization rate showed a relatively flat trajectory

21  from CY 2005 through 2008. However, following implementation of the Nine Point Plan in

22  January 2009 there was an increase in TBS for CY 2009 and – when TBS equivalents were

23  combined with TBS increases for CY 2010 – the utilization rate nearly reached the four percent

24  benchmark goal. It is very possible that once the CY 2010 data lag problems associated with

25  implementation of the Short-Doyle Phase II Medi-Cal claiming software are resolved, total

26  statewide TBS utilization could reach or exceed four percent.

27        The second chart (below) displays statewide numeric totals for TBS utilization,

28  combining the TBS numbers with the TBS equivalents for the year 2010.

29

30



This chart requires some explanation.  For CY 2010, the count of TBS recipients includes 4,529
children from the CDMH claims files (reflecting the data lag described above), plus an additional
945 from the MHPs (claims not yet entered into the Medi-Cal software), along with 2,360
recipients of TBS equivalent services as certified by the Special Master.  For 2010, the
numerator is the 2010 count of TBS and equivalent recipients, while the denominator is the 2009
count of EPSDT children with mental health.  Because of the data lag problem, the actual
number of children receiving EPSDT mental health services in 2010 (on which the benchmark is
based) is not yet available, so the Settlement Team agreed to use the 2009 EPSDT mental health
total for the calculation.  As noted on the chart, the addition of the TBS equivalent services to the
chart totals raises the total number of children receiving TBS or equivalent services to nearly the
four percent goal.  Once the Medi-Cal Phase II claiming data lag problem is resolved, the
statewide total will likely exceed the benchmark goal.

Additional criteria for certifying the 18 MHPs that achieved the four percent benchmark

In addition to achieving the quantitative four percent benchmark, the Exit Plan requires
that MHPs engage in important qualitative TBS-related local activities before they can be

1    certified as having met the Exit Plan requirements.  These activities include:

2    • Implement quality TBS to the satisfaction of the Special Master.

3    • MHPs demonstrate their ability to accurately employ procedure codes, cost reports and
4      CSI data reporting for TBS services.

5    • Engage other key local stakeholders.

6    • Demonstrate commitment to outreach to, provide TBS training to, and engage with
7      professional staff and contract providers in the MHP.

8    • Demonstrate commitment to outreach to, provide TBS training to, and engage with
9      family members and youth in the MHP.

10   As noted above, multiple information sources are available to determine whether or not an MHP

11   has put sufficient effort into this array of activities to earn certification.  CDMH staff has been

12   very helpful in developing, collecting, analyzing, and interpreting information about each MHP's

13   effort.

14        Based on the information available, I have certified the 18 MHPs that achieved the four

15   percent benchmark as also having satisfied the other performance requirements of the Exit Plan.

16   Copies of these 18 MHP certification letters are included in Exhibit D: County MHP

17   Certification and Trajectory Letters.

18

19   <u>The nine Level II MHPs that did not meet certification criteria</u>

20        Progress reports for the Level II MHPs that did not meet the certification criteria show

21   that most either satisfied the qualitative performance requirements or showed effort to fulfill

22   these requirements.  Four Level II MHPs (Alameda, Monterey, San Bernardino, and Tulare)

23   showed good performance and increased utilization over the past three years and it is likely these

24   MHPs are on a solid TBS utilization trajectory with the capacity to reach and sustain the four

25   percent benchmark within the next 12 to 18 months.  Two MHPs (Kern and Solano) have shown

26   good performance but modest utilization gains and, with additional time and support and training

27   from CDMH, I am confident they will reach and sustain the benchmark.  Three MHPs have

28   either not been participating in the accountability and performance requirements (Merced) or

29   they show very low (San Joaquin) or declining (Fresno) TBS utilization – these three MHPs will

30   require additional follow up from CDMH to problem solve and engage fully in all the Nine Point

1   Plan requirements (per Post Exit Requirements in Point Nine, Exhibit A, pages 15-19).

2

3   Level I MHP Performance

4        Although Level I MHP performance is not a factor in Court exit, it is helpful to review

5   efforts to increase TBS utilization among these 29 MHPs. Five Level I MHPs (Calaveras,

6   Glenn, Mendocino, Napa, and Siskiyou) showed strong engagement and TBS utilization above

7   two percent, with Napa County surpassing the benchmark requirement (4.48 percent for CY

8   2010). On the other hand, six MHPs have not fully engaged in the Nine Point Plan requirements:

9   Lake, Mono, Plumas, and Tehama Counties need to improve their implementation efforts, while

10  Colusa has been non-responsive to CDMH inquiries and Modoc has not submitted any of the

11  required paperwork. These six MHPs will require additional follow up from CDMH to problem

12  solve and fully engage in the Nine Point Plan or to receive technical assistance and monitoring

13  (per Post Exit Requirements in Point Nine, Exhibit A, pages 15-19). Two additional MHPs

14  (Humboldt and Yolo) have fully engaged in the local meeting efforts but their utilization data

15  show precipitous declines, which may be attributed to the Phase II data lag problem discussed

16  above; CDMH should look into their situations and determine the appropriate course of action.

17

18  State Requirements for Court Exit

19       The majority of state requirements that must be met prior to exit were embedded in

20  Points One through Eight of the Nine Point Plan. As noted at the beginning of this report and in

21  the Special Master's November Report, the state has already fulfilled these core requirements.

22  There are, however, a few additional state requirements listed in the Court's April 23, 2009

23  Order Approving Exit Plan:

24       Implement Points One through Eight of the Emily Q. Nine-Point Settlement Plan

25       CDMH must fully implement Points One through Eight of the TBS Nine-Point

26       Plan, as follows:

27       1.  Reduce administrative barriers to TBS and not replace them with additional

28          barriers;

29       2.  Clarify eligibility for TBS and not confuse eligibility at a later time;

30       3.  Establish an accountability system capable of determining and documenting

1         TBS services by the MHPs;

2     4.   Establish a fidelity performance model for TBS;

3     5.   Develop coordinated linkages with other state agencies that serve TBS class

4         members, especially the California Department of Social Services, Juvenile

5         Justice agencies, and the Administrative Office of the Courts;

6     6.   Develop and implement a comprehensive training program for TBS providers

7         and administrators at the local level;

8     7.   Develop, publish and maintain training manuals consistent with the

9         comprehensive TBS training program; and

10    8.   Develop and implement a TBS outreach effort to children, families, providers

11        and other stakeholders.  (April 23, 2009 Exit Plan, page 6.)

12 Clearly, the majority of these requirements have already been met as described in the November

13 report.  However, there are several small items under bullet 5 that require brief discussion.

14       Bullet item 5 specifically identifies state-level agencies that play an important role in

15 ensuring Emily Q. class member access to TBS statewide.  Of these, CDMH has established an

16 on-going relation with the California Department of Social Services (CDSS), largely through a

17 data sharing agreement that was central to the success of the TBS Data Dashboard.  CDMH and

18 CDSS were able, for the first time, to develop a combined client database for children in the

19 class.  Hopefully, these two departments will continue to work together to support CDMH's

20 ongoing information requirements through 2012 and perhaps beyond.  CDMH also convened a

21 one-time multiagency coordination of care meeting that included state level juvenile justice

22 representatives and a representative of the Administrative Office of the Courts – this meeting

23 greatly contributed to completion of the *TBS Coordination of Care and Best Practices Manual*.

24 In my November Report to the Court, I recommended that CDMH reconvene a similar meeting

25 at this level as a corollary to MHP local multiagency coordination of care meetings.  To my

26 knowledge, this has not yet happened.  I recognize it is time for the Court to exit and this one

27 detail does not merit interfering with state certification; nonetheless, this item reflects an

28 important need and opportunity to promote state-level interagency coordination.  In order to

29 promote ongoing TBS discussions at the state level, I encourage CDMH to consider using the

30 Health and Human Services Agency State Interagency Team (SIT) as a venue for promoting and

1   coordinating state-level services.

2       Bullet item #6 addresses comprehensive TBS training for providers and administrators at

3   the local level, and CDMH has made a strong commitment to sustain TBS training. Although

4   during prior years, the MHPs and providers underutilized these training opportunities, recently –

5   especially during the Special Master's MHP site visits to review TBS equivalent services, the

6   Level II MHP conference calls with CDMH, the Small County Strategy meetings, and statewide

7   Family and Youth Strategy conference calls – county and provider staffs, families, and youth

8   have expressed a great deal of interest in training to increase quality and capacity in providing a

9   positive behavioral approach, which is at the core of TBS, to serving children and families. In

10  order to take advantage of this increased interest in TBS training, I encourage the state to identify

11  and commit increased training funds to the Nine Point Plan training effort commensurate with

12  the training opportunities that are emerging across the state. It is my understanding that the

13  plaintiffs will be submitting a proposal to the Court for consideration that would provide critical

14  resources to support and promote CDMH's effort to provide the needed and necessary training

15  necessary to sustain utilization, increase capacity, and improve the quality of TBS statewide.

16      Finally, the Court Exit Order identifies five additional state requirements (April 23, 2009

17  Exit Plan, pages 6-7):

18  • Implement Information Notices and/or Policy Letters regarding TBS.

19  • Implement the State TBS Data Dashboard.

20  • Document the MHPs' ability to answer the four key accountability questions identified

21      in Point Three of the Nine-Point Plan.

22  • Sustain the ASIS and TACT groups.

23  • Produce an Annual Assessment of MHP TBS Performance in October 2009 and

24      October 2010.

25  I have reviewed and assessed CDMH performance of these five items using the following

26  documents:

27  • Information Notices and Letters to MHPs.

28  • Annual Level I and II County MHP Progress Report –Point Three.

29  • Annual Assessments of MHP TBS Performance to the Court.

30  • Special Master Site Visits to County MHPs.

1        • Settlement Team and SuperTACT meetings.

2        • TBS Utilization –County MHP Dash Boards.

3        • Small County Strategy.

4    Based on review of these documents, along with prior completion of Points One through Eight, I

5    find that CDMH has completed all the requirements for Court exit.

6

7    **Special Master's Recommendations Regarding Court Exit**

8        1. I recommend that the Court exit the Emily Q. matter and that CDMH take over

9           management of TBS per the post-exit requirements described in the Nine Point Plan and

10          further elaborated in CDMH Point Nine, Transition Plan, filed with the Court on January

11          7, 2011.

12       2. I further recommend that at this time CDMH take the necessary measures as specified in

13          the Court Exit requirements to address low performing Level II County MHPs, especially

14          Fresno, Merced, and San Joaquin Counties.

15       3. Additionally, I recommend that CDMH work directly with low performing Level I MHPs

16          as identified in the MHP Progress Report, especially Colusa and Modoc Counties, using

17          technical assistance and training through the Small County Strategy.

18

19   Proposed dates for the next Court appearance

20          The Order of Appointment provided that a hearing shall be held four weeks after the

21   filing of the Special Master's report, which date will be May 30, 2011.  Unfortunately I will be

22   out of the country on that date, returning June 8, 2011.  I therefore request the Court consider the

23   following alternative dates – June 14, 15, 16, 21 or 22, 2011, at which times the Special Master

24   and all parties are available for a hearing.

25

26   **The Post Exit Environment In California:**

27          Now that the state has fulfilled its obligations as set forth in the Nine Point Plan and is

28   moving forward per the post-exit requirements, I believe TBS is on a solid trajectory toward

29   sustainable growth across all the California MHPs.  Nonetheless, I have concerns about the

30   emerging political and service delivery environment in California.  I would like to describe my

1    concerns here in this final section of my final report in order to caution the state as it moves

2    forward in uncertain times.  These observations do not change my recommendation that the

3    Court exit the Emily Q. matter.  Rather, I simply want to express my concerns to stimulate the

4    thinking of the many people that have worked so hard for so many years to reach a successful

5    conclusion to Emily Q.  Perhaps by looking ahead, we can better preserve and protect the gains

6    that have been made to ensure class access to TBS.

7         Clearly, these current times are very exciting and challenging in California as Governor

8    Brown's Administration moves rapidly forward to structurally address the budget deficit, to

9    improve organizational efficiency and effectiveness at the state level, and to realign programs

10   and funding down to the counties.  As Special Master I want to call attention to some of the

11   changes already underway, changes that are being proposed, and the emerging questions

12   regarding California's implementation of its EPSDT/Medi-Cal program in a post-exit

13   environment.  I wish only to inform the Court and the state and the parties as to the possible

14   conditions that may impact the California EPSDT Medi-Cal program in the months and years

15   ahead.

16        The Governor has proposed changes in the state and county service delivery relationship

17   along with reorganization within and across state departments.  Much of what is being proposed

18   in the areas of realignment – transferring state responsibilities and funding to the counties – has

19   already happened or is being planned through new legislation. Briefly my observations and

20   concerns are as follows:

21   •    Currently, the cost of TBS, as well as all EPSDT Medi-Cal mental health services for

22        children's funding, is shared approximately 40% state, 50% federal and 10% county.

23        Oversight and accountability over TBS is provided by CDMH in accordance with the

24        Nine Point Plan.  This process has been successful, as demonstrated by measured

25        progress summarized in this report.

26   •    Under county realignment, the state portion of EPSDT fiscal responsibility – which to

27        date has been entitlement driven and uncapped – has shifted to the counties, using

28        funding from MHSA and extended taxes.  Also, under the proposed state

29        reorganization, TBS as well as all EPSDT Medi-Cal requirements for children's mental

30        health oversight and accountability may shift from CDMH to CDHCS.

1    • However, ongoing funding through tax extension to sustain the state portion of EPSDT
2       Medi-Cal is not guaranteed (if there is no election, or if voters do not approve a tax
3       extension); nor are there county maintenance of effort requirements in the new
4       realignment legislation over dedicating MHSA funding for the state share of EPSDT
5       Medi-Cal, or provisions for ensuring dollars are dedicated for entitlement growth; nor
6       does CDHCS currently have the same level of institutional commitment and capacity as
7       CDMH to oversee and sustain TBS.
8    • My concern is that, following realignment and state reorganization, funding will
9       decline, counties will not maintain the state portion of EPSDT Medi-Cal necessary to
10      sustain TBS, CDHCS will not have the staffing expertise to sustain the level of
11      oversight and accountability currently provided by CDMH, and gains recently made in
12      TBS will be lost.
13   As noted above, I am expressing these concerns in order to stimulate thinking among all who
14   have worked so hard to bring the Emily Q. matter to a successful conclusion; the more we
15   understand about the new service environment in California, the better we will all be able to
16   ensure that the gains made in TBS utilization will be sustained well into the future.
17
18      In closing, I would like to again thank the Court for affording me the privilege of serving
19   as special master for the Emily Q. case.
20
21   Dated:  May 2, 2011                          Respectfully submitted,
22
23                                                /s/
24
25                                                Richard Saletta, LCSW
26                                                Special Master
27